661 A.2d 1202

CANDY RENDINE AND BERNADETTE LORESTANI, PLAIN-
TIFFS–RESPONDENTS, v. EDWARD PANTZER, D/B/A PANT-
ZER MANAGEMENT COMPANY, DEFENDANT–APPELLANT.

Argued March 13, 1995—Decided July 24, 1995.

*Paul A. Rowe* argued the cause for appellant (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys; *Harriet F. Klein* and *Bruce D. Greenberg,* on the briefs).

*Nancy Erika Smith* argued the cause for respondents (*Smith Mullin,* attorneys; *Ms. Smith, Christopher P. Lenzo,* and *Jon W. Green,* on the briefs).

*Matthew R. Gabrielson,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

STEIN, J.

Plaintiffs, Candy Rendine and Bernadette Lorestani, brought this action pursuant to the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, seeking damages primarily on the basis that their employment wrongfully was terminated because they had become pregnant. Their claims were tried jointly. *See R.* 4:29–1. After a jury verdict, Rendine recovered a judgment of $460,000, consisting of $225,000 in compensatory damages and $250,000 in punitive damages; Lorestani's judgment of $475,000 consisted of $225,000 in compensatory damages and $250,000 in punitive damages. Both plaintiffs also recovered prejudgment interest, counsel fees, and costs. The Appellate Division affirmed the judgment in all respects, 276 *N.J.Super.* 398, 648 *A.2d* 223 (1994), one member of the panel dissenting only from the court's affirmance of the portion of the judgment reflecting the jury's award of punitive damages. Defendant, Edward Pantzer, owner and president of Pantzer Management Company, appeals as of right from the judgment awarding punitive damages to plaintiffs. *R.* 2:2–1(a)(2). We granted Pantzer's Petition for Certification raising issues concerning joinder, adequacy of jury instructions, emotional-distress damages, and counsel fees. 138 *N.J.* 272, 649 *A.2d* 1291 (1994).

I

We adopt and set forth the comprehensive summary of the trial testimony included in the Appellate Division opinion:

Plaintiff Rendine earned a degree in accounting in 1979 and then worked as an auditor and financial analyst with a bank for four years. In 1983 she accepted a position with defendant as assistant controller. Defendant Edward Pantzer was the president and owner of the company and Michael Pantzer (Michael), his

brother, was the executive vice-president. In 1985 they hired Steve Weinerman as controller; he was Rendine's immediate superior.

When defendant first interviewed Rendine, he asked her if she had plans to marry and have children "within five years of being married." Rendine answered that she "hoped to be married," but had no plans for children. As assistant controller of residential properties, Rendine supervised "a staff of accountants for accounts receivable, accounts payable, security refund ... [and] payroll." There were about twenty employees at the central office in Tenafly, plus others who worked at the various properties. Rendine was a member of the executive committee, which met weekly and made "all the major decisions of the company." The other members of the committee were the defendant Edward Pantzer, Michael Pantzer, Weinerman, who was Michael's assistant, and Bill Bodger, head of acquisitions.

When Rendine began work, her first assignment was to revamp a six-month old computer system, verifying information about thousands of tenants at numerous properties. She spent some three months visiting the properties in New Jersey, Pennsylvania and Delaware, collecting the information, and then entering it into the computer. She worked every evening until six or seven and sometimes until nine. Rendine also prepared a manual explaining the procedure for entering information into the computer.

In 1984, after Rendine announced her engagement to marry, she said that defendant called her into his office and asked her to polish some silver for him. "[H]e said that since I was getting married and probably going to have silver once I was married, that it would be good practice for me to polish his silver." Rendine politely declined. Defendant denied that this occurred.

With her November annual performance reviews, Rendine received a fourteen-percent salary increase in 1984, fourteen percent in 1985, and eleven percent in 1986. She also received Christmas bonuses for these years of $2500, $1500, and $2500. In January 1986 Michael wrote Rendine a letter, thanking her for doing a good job. Suzanne Rivera, one of the employees whom Rendine supervised, corroborated her competence and ability, and her patience and fairness in dealing with those who worked under her.

Lorestani was hired as a staff accountant to assist Rendine in June 1984. She had five years' experience in bookkeeping or accounting and she earned an accounting degree in 1985. In her job interview, defendant asked her whether she was married, and she said she was engaged. He also asked if she planned to have children. She answered that she "wasn't really thinking at that point about children." Rivera, who was hired in June 1987, was also asked in her job interview about plans to have children.

Lorestani monitored the apartments occupied by defendant's employees, met with Michael each month to review them, and assisted Rendine with the preparation of financial reports. Rendine, who trained Lorestani, thought she was "a very good employee.... She executed all her functions well." Rivera corroborated Lorestani's competence and excellent job performance. Weinerman was also very happy with Lorestani's job performance. Five months after she was hired, Lorestani, whose starting salary was $19,000 a year, received an eleven-percent

increment. The following year, 1986, she again received an eleven-percent increment, and in 1987 she received a twelve-percent increment. She also received Christmas bonuses in the amounts of $500 in 1984, and $1000 in 1985 and 1986.

Lorestani's responsibilities increased during the time she worked for defendant. She assumed responsibility for dealing with the managers in the field and took over the cash reconciliations and money-market account activity on about twenty properties. She worked long hours, arriving early in the morning, frequently staying until 7 p.m., and also working on weekends when needed.

Plaintiffs were "inundated" with work, including new properties, and Rendine decided that a bookkeeper should be hired. After consultations with Weinerman and defendant, the bookkeeper position was created. Pam Gaetano was hired in 1987; she worked under Lorestani, who trained her. Rendine evaluated Gaetano, and found her to be "an okay employee." With no math or accounting background, Gaetano "continually had problems understanding ... a bank reconciliation, doing anything that really had to do with math." Although both Rendine and Lorestani "kept on trying to train her extensively," Rendine felt that Gaetano was unable "to take on staff accountant responsibilities."

Another staff accountant, Dominic Battista, was hired in 1985 or 1986 but he left after about a year. When Lorestani began working with defendant, she was assigned to clean the kitchen. However, when Battista was hired, she "noticed that he did not have kitchen duty. So, I talked to Mr. Michael Pantzer and I asked why that was, and he took me off of the kitchen duty instead of putting Dominic on."

Before Battista was hired, Weinerman told Rendine that "he wanted to hire a male for that position, that they really would not consider a female at that time." He told her that:

[I]t would be in the best interests of the company to look for a male because Bernadette and I had recently been married and we were of child bearing age and our, what do they call it, our biological clock was ticking to have children, our time was running out because we were getting older.

The issue of the gender of the new accountant was discussed at an executive committee meeting, where everyone except Rendine agreed with Weinerman's theory. Weinerman denied making this comment.

Rendine was married in December 1984 and purchased a home with a substantial mortgage in October 1985. Her husband's salary was about the same as hers. Both salaries were needed to carry the home. Lorestani was married in May 1985, and purchased a home, with a mortgage, in November 1985. Both Lorestani and her husband had substantial student loans to repay and were supporting her husband's younger sister. Lorestani and her husband were both earning the same salary; both incomes were needed for their support.

In late December 1986 or early January 1987 Lorestani told Michael Pantzer that she was pregnant. She told him that she planned to return to work, and that her sister would take care of her child. "He was very happy for me. He congratulated me." When asked when she would return, Lorestani answered in four or five weeks with a regular delivery, or six to eight weeks if she needed a Caesarean. Lorestani discussed her maternity leave many times with defendant,

his brother, Michael, and Weinerman. She repeatedly told each that she planned to return to work when she was physically able. They each assured her that her job would be available on return. Rendine also announced her pregnancy in January 1987 and defendant, Michael and Weinerman all "appeared to be happy for me." She advised them from the outset that she planned to take at least three months' maternity leave, and then return to work. On several occasions, she was assured that "your job will be waiting for you." Rendine testified about an executive committee meeting while she was pregnant, at which her colleagues said that she looked like a "beached salmon." However, defendant and Michael denied that they or anyone else made any jokes or comments about pregnancy in general or about Rendine in particular. Defendant said that he would not tolerate any such remarks, or discrimination in his company.

Dean Delianites, a CPA as of 1985, with four years' experience in public accounting, was hired as commercial accounting manager in November 1986. Rendine saw him leave work early, at 4 p.m. every day, to attend law school. Rivera corroborated that Delianites left work early, adding that Delianites told the staff that he would make up the time "by working through his lunch hour," but Rivera saw him studying law while eating at his desk.

Rendine's duties were divided between Delianites and Weinerman while she was on maternity leave. She had attempted to train Delianites but he was "too busy" and uninterested. Rendine worked with residential buildings, an area in which Delianites had no experience or training. Lorestani and Rendine trained Gaetano to take over Lorestani's duties but Gaetano had difficulty learning the work.

Lorestani started her maternity leave on June 15, 1987, on the advice of her doctor. This was two weeks earlier than planned because she developed toxemia. On her last day of work, she talked to defendant "and he wished me luck, he said he hoped everything worked out fine and he gave me a hug and he told me my job would be waiting for me."

Lorestani delivered by Caesarean on July 13, 1987. Her husband called her office that day, and she called a few days later. Weinerman congratulated her and told her to take as much time off as she needed and said her job would be waiting. Michael also congratulated her, told her that a return to work in six to eight weeks would not be a problem, and also said her job was waiting for her.

Weinerman called her at home the day she was discharged from the hospital, and asked her for a date of return. She told him it would be six to eight weeks, and "[h]e said fine and when I was ready, my job was there for me." Lorestani talked to someone in the office at least once a week during her maternity leave. Weinerman always asked her when she would return, and she always told him six to eight weeks.

In August, when eight weeks passed, Lorestani arranged an appointment with Weinerman to discuss her return. She had made her child-care arrangements, was excited about returning, and brought her baby with her for the appointment with Weinerman. Weinerman "told me that things were running very smoothly and that there was no longer a place for me and he was firing me." Weinerman denied terminating Lorestani on this particular day; rather, when she called in early September to say she was ready to return, he told her on the telephone that he had

no job for her. However, Rivera saw Lorestani that day at the office, arriving happy and showing off her new baby. When she left Weinerman's office, she approached Rivera; she was upset and crying, and "she told me she had just been fired."

Meanwhile, Rendine's last day of work was July 24, 1987, and she gave birth early, on July 26. About a week later, Weinerman called and told her that they were promoting Gaetano from bookkeeper to staff accountant. In August 1987 Rendine received a memo from Michael, dated August 19, to all defendant's personnel, advising that as of August 12 Delianites was promoted to the position of assistant controller, and Gaetano was promoted to the position of staff accountant. The memo also announced that Rendine had given birth to a baby girl, and Lorestani to a baby boy. "As soon as their maternity leaves are over, we enthusiastically welcome the return of both Candy and Bernadette to the accounting department."

Rendine was shocked. In her conversation with Weinerman a week before, he had not mentioned Delianites's promotion. She felt that her position with the company was endangered, since there was no need for two assistant controllers. "I was being replaced and I had only been out of work for three weeks." She immediately called Weinerman, who "said that they felt the need to promote these two people."

About a week later Rendine called the office "just to see how everything was going, if anybody needed me." She discovered that "Dean had taken over my desk," including "access to all my personal belongings." She then called Michael, who was "very cold." She was upset because she had always had a fine relationship with Michael, who attended her wedding with his wife.

In October 1987 Rendine met with Michael and Weinerman to discuss her return; she was given a memo entitled "Candy's Responsibilities." She was told that she would retain her title but would no longer have the responsibilities and authority she had before. Her new job was to work on special projects. However, she had already worked on the special projects listed, and they required very little time. Rendine's new job duties were "practically nothing" compared to "the responsibilities I had before I went on maternity leave" and would have taken her about three days a month to complete.

Rendine returned to work on November 11, 1987, after an absence of thirteen or fourteen weeks. Her desk was "isolated from the other employees." It was "right next to the men's bathroom," noisy and filthy dirty. She spent the first day cleaning it. There were no office supplies and no access to the computer. Her "personal belongings were scattered all over the office." No work was assigned to her the first day.

Defendant, who had expressed appreciation for her work just a month before she left, was now very cold toward her, "and I felt like a stranger." Michael, with whom she had worked closely and had a "wonderful working relationship," was also cold. Weinerman, with whom she had had "a friendly, amicable working relationship," was now "very short," talking to her only when necessary. The people in the office whom Rendine had supervised, and whose questions she spent most of her day answering, "wouldn't even talk to me."

Rivera corroborated Rendine's account of her return to work. According to Rivera, Rendine had more knowledge about the residential accounting functions, but Weinerman and Delianites told the staff that Delianites would be handling their questions. Delianites admitted that in November 1987, when Rendine returned from maternity leave, he was still learning her job. Nevertheless, Weinerman reprimanded Rivera and two others for taking their questions to Rendine rather than Delianites.

According to Weinerman, Delianites complained about Rendine's socializing and her job performance. Once, Rendine went onto the computer without checking first, "and it caused a minor problem." On another occasion, when Delianites asked her to correct some journal entries that she had worked on, "she told him she was too busy." Rendine explained that routine office procedure, to return journal entries to the person who wrote them, to review for accuracy, had not been followed.

Early the following week, Weinerman called Rendine into his office. He told her that he had complaints about her, that she had a bad attitude, and that she had better change. He told her that "things ran smoothly when I wasn't there" and that "people were complaining that I was socializing." He talked for five minutes, refusing to listen to anything Rendine had to say. Rendine became angry, because "people had a bad attitude toward me." Weinerman "kept on yelling." Rendine said "I can't take this any more," and "this is not fair." She got up and walked out. Weinerman "told me that if I left, that would be it." When Rendine asked, "does this mean you're firing me?" Weinerman answered "yes," and discharged her.

Weinerman basically corroborated Rendine's account of their verbal encounter, and asserted that he terminated her because she was insubordinate. Defendant, Michael and Weinerman denied any prior discussion, plans or intent to terminate Rendine. Weinerman and Michael denied that their attitude toward Rendine was cold when she returned from her leave, and denied telling staff not to speak with her.

Defendant, Michael and Weinerman all considered Rendine a valuable employee. However, they said she lacked supervisory experience; her interpersonal skills were mediocre; she had difficulty dealing with people; she was unnecessarily "demanding and short with her people," and had conflicts with them.

According to Weinerman, when Delianites took over Rendine's job, the situation in the office improved. Delianites was capable of handling Rendine's responsibilities and did so effectively. "People started working more closely together without problems.... [A] very good working rapport developed in the office. Everybody respected Dean" Delianites.

However, on cross-examination Weinerman admitted that in his last evaluation of Rendine, in 1986, he rated her above average in effectiveness in dealing with others, and in all of the other specific review factors. In contrast, Delianites was not rated any higher than Rendine, and was rated lower than her in leadership. Rivera, who worked under Delianites for four months, thought that "he did not have enough knowledge to run the department well," and she "had to train him" in her field, security deposit refunds.

Weinerman admitted that he agreed to keep Rendine's job open for her, but never "discussed a time frame," and never promised her that her responsibilities would be the same. According to Weinerman, Rendine told him that she was having difficulty finding child care.

Defendant and Michael Pantzer said that the company had a maternity leave policy providing twenty-eight days with pay. The policy was "flexible enough" to allow for a longer leave, but it would be without pay. A maternity leave "would never be open-ended." The employee must advise the company of the date of her return. Defendant was "certain that either Michael Pantzer and Steve Weinerman and or myself made it clear to Candy that she was going to get a paid four weeks maternity leave and we expected her to be back at the end of that." Rendine denied that she was ever told about this policy.

According to Weinerman, if both Rendine and Lorestani had returned to work within thirty days, they would have been given their prior jobs. However, Weinerman did not intend to demote Delianites and Gaetano. Weinerman explained that since defendant acquired four commercial properties in 1987 and wanted "to bring all of our accounting and management in-house," he determined to create a second assistant controller position, with one assistant responsible for commercial and the other for residential. Rendine and Delianites would be the two assistants. However, Weinerman admitted that he never told Rendine about this plan; he only told her that she would be working on "special projects." Weinerman originally testified that his plan was never implemented because Rendine was terminated. On cross-examination, he said that he abandoned this plan before his meeting with her in October.

Weinerman admitted that he had supervised Delianites elsewhere before coming to work for defendant, that they had stayed in touch, that he brought Delianites into the company, and wanted a chance to promote him. He also admitted that he kept Delianites's promotion a secret from Rendine, that Delianites and Gaetano were the only two people who worked for defendant who were promoted before their annual performance reviews, and that Rendine's job functions were so small when she returned from leave that "it was not a hardship" for the company to discharge her.

As to Lorestani, Weinerman admitted promising her that her job would be kept open but never mentioned any particular period of time, and never promised that it would be kept open indefinitely. Weinerman complained that Lorestani would not give a definite date for her return to work, since she was "still working on" child care.

Weinerman explained that Gaetano was doing both Lorestani's accounting job and her own bookkeeping job, so that there was no need for Lorestani to return. However, he admitted that he hired a new bookkeeper, Lynn Rochford, just days after he discharged Lorestani. Weinerman rated Lorestani higher than Gaetano in their performance reviews, explaining that this was only because Lorestani had more experience.

However, Rivera, who helped train Gaetano, found that she had difficulty with simple bookkeeping and accounting concepts. Gaetano "constantly needed assistance ... to do her job." Gaetano had difficulty dealing with the property

managers, and Rivera frequently took their calls and corrected Gaetano's mistakes. Rochford also criticized Gaetano's job performance. Weinerman nevertheless concluded that Gaetano "was as good or better as the staff accountant" than Lorestani.

Defendant claimed Rendine was an insubordinate and unsuitable employee. Defendant claimed that Lorestani was not reinstated because her services were not needed, failed to inform defendant of the time of her planned return, delayed coming back to work, and the operation ran more smoothly without her because of "bad relations with her coworkers."

The defense contended, through defendant Edward Pantzer and Weinerman, that its unwritten policy fixed the length of paid maternity leave at four weeks (plus sick and vacation days) but that it did not limit the allowable length of unpaid leave. In contrast, defendant gave no paid leave for disability beyond sick and vacation days. Weinerman testified that exceptions for unpaid maternity leave were "invariably granted," if an employee provided defendant with a return date and kept him advised of developments.

Defendant produced as witnesses four of his resident managers and three of his leasing agents who took maternity leaves of absence and successfully returned to their positions with defendant. Although three took their maternity leaves after defendant was served with the summons and complaint in July 1989, the other four took their leaves earlier. All seven of these women took no more than six weeks leave, consisting of thirty days with pay plus accrued vacation or personal leave, and all seven worked at the sites of defendant's properties; none worked in the central office. Jeanette Croce, an assistant controller, who did not work in the central office, was allowed to take a maternity leave of eleven weeks in 1991, which included five weeks of unpaid leave. In contrast, plaintiffs' witness, Rivera, took a five-month maternity leave in 1988. Upon her return she found she had much less responsibility than before, and she resigned after two weeks.

Defendant also admitted that he terminated his personal secretary, Kathy Rega, in part because she was unable to work after 5 p.m. Defendant explained that Rega could not work later because she had a part-time job in the evenings. However, at a prior deposition, defendant testified that Rega was unable to work after 5 p.m. because of her family obligations. Defendant's current personal secretary, Mary Beth Chvisuk, had one child when he hired her, and discovered she was pregnant some sixty days later. Nevertheless, he wanted her to return to work after a maternity leave. On cross-examination, he admitted that this occurred after he was served with the summons and complaint in the present case.

The defendant company had four employees in the past few years who were injured or ill; defendant held their jobs open for them, one as long as six months, and did not require them to specify their dates of return. Michael admitted that the difference between defendant's policies for maternity leave and sick leave was that those out on sick leave were not required to come back at a specific time but those on maternity leave were. Also, the employees who were allowed extended sick leave were treated differently from Rendine, in that they were allowed to return to their same positions, with their same responsibilities and authority.

Rendine applied for unemployment compensation benefits. Defendant contested her application. Unrepresented by counsel, she attended a short hearing on her claim. She did not raise her discrimination claim at that hearing because "I didn't think that that was the place to discuss it." The hearing dealt only with her dispute with Weinerman resulting in her termination. The decision was adverse to Rendine, and she took an administrative appeal but lost. She did not appeal further because it would have cost her more than the value of the six weeks of benefits at stake.

Michael refused to give Rendine a reference because she was terminated. Nevertheless, she began looking for a new accounting position immediately after her discharge. She described an extensive job search, consisting of contacting employment agencies, sending out thirty resumes in 1987 and one hundred in 1988, making telephone calls, responding to want ads, and using personal contacts. She was looking for any reasonable salary, including one lower than her earnings from defendant. In 1988 she became pregnant again and stopped looking for work in October of that year. She resumed her job search in January 1989 sending out sixty or seventy resumes, contacting employment agencies, and reviewing want ads. She would have accepted around $25,000 per year, down from the $38,000 she had earned with defendant. Finally, in February 1991, she stopped looking for work, frustrated that she could not find anything. The employment agencies "said the economy was bad, there weren't jobs." Rendine could not afford to accept the minimum wage, because of her child care and other expenses. She intended to resume her job search when her children, ages four-and-a-half and three at the time of trial, went to school.

Rendine described the hardship of losing fifty percent of her family's income. She and her husband had to refinance their mortgage with an adjustable rate. They could no longer pay their bills. Their social life, entertainment, vacations and clothing purchases were adversely affected. They depleted their savings, and borrowed money from Rendine's parents. Rendine said that she changed from "laid back" and "relaxed" to "uptight." She was always worried about paying bills. She and her husband constantly had fights about money. She was sometimes unable to sleep, and had nightmares about her employment experience. She was frustrated, angry and depressed. Rendine lost her self-confidence and self-esteem, and was unable to face her friends. Even at the time of trial, she was still "having a very difficult time just coping with the situation."

Weinerman provided Lorestani with an "okay" but not "great" letter of recommendation and she immediately began looking for work after her termination. She registered with employment agencies, sent out about twelve resumes each month, and looked at the want ads every day. In 1987 she had three or four interviews, but was not offered any work. She became pregnant again in late 1987, but continued to look for work until May 1988. She resumed her job search about two months after her delivery; she again had a Caesarean, and gave birth to twins. Later in 1988 she was hospitalized and unable to look for work. She did not claim lost earnings in this case for her periods of disability.

In 1990 she turned down a job offer for $7 per hour. Later in 1990 she accepted a position as a part-time bookkeeper with a law firm, for $13,000 a year. However,

she encountered difficulties there with a hostile co-worker and was forced to resign. In late 1991 Lorestani began working thirty hours per week for $4.50 an hour, and continued at that job through trial.

Lorestani's husband took a second job as a waiter, Monday through Friday nights, and Saturday and Sunday. He went directly from his full-time job, as an engineer, to the second job, arriving home after midnight. Lorestani "felt like I was a single mother" but "was very thankful that he was willing to work that hard." Lorestani's family members purchased clothes and shoes for the children. She was embarrassed and humiliated, "but we needed it." She gained a lot of weight and lost her self-confidence. Before she lost her job, she and her husband frequently entertained in their home. She explained: "After I was fired ... I was just very bitter and very angry and I resented our friends. They all worked and they had kids and they weren't fired.... I became ... not a nice person to be around...."

The jury obviously resolved the conflicting evidence about whether defendant's sick and maternity leave and employment policy was discriminatorily administered in plaintiffs' favor.

[276 *N.J.Super.* at 407–20, 648 *A.2d* 223.]

## II

■ Both before trial, and in his motion for a new trial, defendant contended that prejudicial error had been committed because of the denial of his motion to sever the claims of the two plaintiffs. In denying defendant's new-trial motion, the trial court rejected the claim that the joint trial had prejudiced defendant, observing that except for two witnesses, all of the other witnesses' testimony had been relevant to the claims of both plaintiffs and, accordingly, the jury would have heard their testimony whether the trials had been joint or separate. The Appellate Division agreed with the trial court's conclusion that defendant had not demonstrated that joinder of the claims had resulted in undue prejudice, noting that the trial court had carefully admonished the jury "that each plaintiff had a separate complaint," which the jury must consider "on its own merits." 276 *N.J.Super.* at 425, 648 *A.2d* 223. Before us, defendant acknowledges that if the cases had been tried separately each plaintiff would have attempted to offer evidence of the circumstances surrounding the other plaintiff's termination, although contending that such evidence would not necessarily have been admissible. Essentially, defendant ar-

gues that irrespective of the likelihood that separate trials would result in virtually the same evidence being twice presented to two juries, the prejudice that resulted from a joint trial of plaintiffs' claims was irremediable, denying defendant a fair trial.

*Rule* 4:29-1(a), which authorizes joinder of claims asserted by multiple parties, provides in part:

[A]ll persons may join in one action as plaintiffs or be joined as defendants jointly, severally, in the alternative, or otherwise, if the right to relief asserted by the plaintiffs or against the defendants arises out of or in respect of the same transaction, occurrence, or series of transactions or occurrences and involves any question of law or fact common to all of them.

The Rule's objective has been described as intending

(1) to foster the virtually unrestricted joinder of persons interested in any capacity in the same claim, whether as plaintiffs or defendants, and (2) to license the joinder of multiple claims, by or against multiple parties, where the claims have the requisite common origin and the necessary common issue of law or fact.

[Morris M. Schnitzer & Julius Wildstein, *New Jersey Rules Service 1954 to 1967* AIV-1037 (special reprint ed. 1982).]

Defendant does not appear to challenge the trial court's conclusion that plaintiffs' claims satisfy the Rule's requirement of a common origin, and the involvement of common issues of law and fact. Both plaintiffs informed defendant's management that they were pregnant at approximately the same time, Lorestani in late December 1986 or early January 1987, and Rendine in January 1987. Their maternity leaves overlapped, Lorestani remaining at home from June 15 to late August 1987, and Rendine's leave extending from July 24 to November 11, 1987. Rendine was terminated approximately one week after returning to work; Lorestani was terminated in early September 1987, according to her testimony on the day she visited the office to make arrangements to return to work. Both plaintiffs alleged that they had been terminated because defendant had discriminated against female employees who became pregnant.

Defendant contends that the trial court should have granted his motion to sever to avoid the risk of prejudice, relying on *Rule* 4:29-2 and *Rule* 4:38-2(a). We do not underestimate the concern that the joint trial of similar claims asserted by several parties

against the same defendant can present a risk that the jury might use the evidence cumulatively, reaching conclusions from the aggregate of the evidence that it might not have reached in assessing the claims separately. We have noted that potential for prejudice in considering the question of severance in the context of criminal prosecutions involving multiple offenses allegedly committed by one defendant. See *State v. Pitts*, 116 *N.J.* 580, 600–03, 562 *A.*2d 1320 (1989). As with civil joinder, our resolution of severance issues in criminal trials is informed by considering whether "assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [*N.J.R.E.* 404(b) ] in the trial of the remaining charges." *Id.* at 601–02, 562 *A.*2d 1320.

Both the trial court and the Appellate Division addressed the severance issue preliminarily by considering whether severance would result in excluding evidence relating to the severed claim, and both courts concluded that virtually the same evidence would have been proffered whether the cases had been tried separately or jointly. 276 *N.J.Super.* at 425, 428, 648 *A.*2d 223. As noted by the Appellate Division, a number of federal courts have ruled that testimony by employees about discriminatory actions by the defendant-employer similar to those alleged by the plaintiff is admissible to prove the employer's motive or intent to discriminate. *See Spulak v. K Mart Corp.*, 894 *F.*2d 1150, 1156 (10th Cir.1990); *Estes v. Dick Smith Ford, Inc.*, 856 *F.*2d 1097, 1102–05 (8th Cir.1988); *Conway v. Electro Switch Corp.*, 825 *F.*2d 593, 597–98 (1st Cir.1987); *Hunter v. Allis–Chalmers Corp.*, 797 *F.*2d 1417, 1423–24 (7th Cir.1986); *Stumph v. Thomas & Skinner, Inc.*, 770 *F.*2d 93, 97 (7th Cir.1985); *Phillips v. Smalley Maintenance Servs., Inc.*, 711 *F.*2d 1524, 1532 (11th Cir.1983); *Morris v. Washington Metro. Area Transit Auth.*, 702 *F.*2d 1037, 1045–46 (D.C.Cir.1983).

Defendant relies on federal court decisions that have excluded testimony of other employees claiming discriminatory treatment analogous to that asserted by the plaintiff. *Schrand v. Federal*

Pac. Elec. Co., 851 F.2d 152, 155–56 (6th Cir.1988); *Haskell v. Kaman Corp.*, 743 F.2d 113, 120–22 (2d Cir.1984); *Moorhouse v. Boeing Co.*, 501 F.Supp. 390, 393–94 (E.D.Pa.), *aff'd*, 639 F.2d 774 (3d Cir.1980). We are in accord with the Appellate Division's observations that the testimony in *Haskell* and *Schrand* was held inadmissible because it lacked relevance. 276 *N.J.Super.* at 427, 648 A.2d 223. In *Haskell*, testimony of former officers of the defendant was offered to prove a pattern and practice of age discrimination, but was held inadmissible because the evidence was statistically insignificant. 743 F.2d at 121. In *Schrand*, testimony alleging age discrimination by two officers of the defendant was held to be irrelevant because they had worked in offices distant from the plaintiff and under different managers. 851 F.2d at 156. In *Moorhouse*, the trial court exercised its discretion to exclude age-discrimination testimony by five former employees of the defendant, who were plaintiffs in separate actions, on the grounds of prejudice and possible confusion, noting that had the cases been consolidated the trial would have involved six plaintiffs and sixteen individual defendants, as well as the corporate defendant. 501 F.Supp. at 392.

▮ Prejudice to a defendant resulting from the joint trial of claims by multiple plaintiffs cannot easily be quantified, particularly if separate trials would not materially alter the evidence offered to support and defeat the claims. Accordingly, our Rules vest the determination whether or not to sever claims to the sound exercise of a trial court's discretion. See *R.* 4:38–2(a). Other courts, confronted with the issue, have determined that the advantages of a joint trial outweigh the risk of undue prejudice. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1420–21 (4th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991); *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir.1974); *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1422 (S.D.N.Y.1989); *cf. Hammons v. Adams*, 786 F.2d 1253, 1253 (5th Cir.1986) (finding no abuse of discretion in serving claims of three plaintiffs involving

different incidents of discrimination as well as different pretexts for discharge).

We are fully in accord with the Appellate Division's conclusion that the trial court's determination to deny severance was a reasonable exercise of that court's discretion. 276 *N.J.Super.* at 431, 648 *A.*2d 223.

## III

Defendant contends that errors in the jury charge, although not objected to at trial, are sufficiently prejudicial as to constitute plain error, requiring reversal of the judgments. *See R.* 2:10–2. Specifically, defendant argues that the jury charge misstated the standard of illegality by which plaintiffs' claims were to be evaluated; that the trial court's instructions erroneously shifted the burden of proof of "pretext" from plaintiffs to defendant; and that the jury charge explaining the mixed motives defense was erroneous. We have carefully reviewed the trial court's instructions to the jury, and are persuaded by the Appellate Division's careful analysis that the jury charge considered as a whole constitutes a clear, understandable, and correct explanation of the applicable legal principles. 276 *N.J.Super.* at 431–38, 648 *A.*2d 223.

## IV

Defendant contends that the portion of the jury's compensatory-damage award that represents emotional-distress damages to plaintiffs is so lacking in evidential support as to be excessive as a matter of law. Defendant acknowledges that the jury's allocation of compensatory damages between economic loss and emotional-distress damages cannot be ascertained. Nevertheless, the Appellate Division opinion assumed that Rendine's award included approximately $105,000 in emotional-distress damages, and Lorestani's award approximately $125,000 in such damages, based on the difference between the jury's total compensatory damage awards and the claimed economic damages of each plaintiff. 276 *N.J.Super.* at 439, 648 *A.*2d 223.

Defendant contends that the absence of expert testimony and other independent evidence corroborating the claimed emotional-distress damages demonstrates the excessiveness of the jury award. The Appellate Division specifically rejected the contention that expert testimony or independent corroboration was a prerequisite to a pain and suffering award in a discrimination case, characterizing defendant's assertions as unsupported. 276 *N.J.Super.* at 442, 648 *A.*2d 223; *see also Bolden v. Southeastern Pa. Transp. Auth.,* 21 *F.*3d 29, 34 (3d Cir.1994) (agreeing "that the approach taken by our sister circuits [that] have dispensed with a requirement of expert testimony to corroborate a claim for emotional distress is more consistent with the broad remunerative purpose of the civil rights laws").

We also note that a 1990 amendment to the LAD, *L.* 1990, *c.* 12, § 1, specifically authorized recovery of emotional-distress damages, and the accompanying Committee Statement noted that the amendment emphasized that the LAD is to be liberally construed so that all common-law remedies are available to persons protected by the LAD. Assembly Judiciary, Law & Public Safety Committee, *Statement to Bills Nos. 2872, 2118 & 2228* (1990) (reprinted at *N.J.S.A.* 10:5–3).

■ Essentially, defendant contends that the trial court's failure to find the emotional-distress-damage award excessive was an abuse of discretion. However, the general principle that trial courts should not interfere with jury-damage awards unless so disproportionate to the injury as to shock the conscience, *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 596–97, 379 *A.*2d 225 (1977), applies with equal force to awards of emotional distress damages in LAD cases. We find unassailable the Appellate Division's conclusion that the trial court's evaluation of the compensatory damage award should not be disturbed:

> Although defendant's discriminatory treatment did not cause plaintiffs to relocate or suffer illness or homelessness, both plaintiffs described in detail their inconvenience and economic loss, physical and emotional stress, anxiety in searching for reemployment, uncertainty, career and family disruption and other adjust-

ment problems. Plaintiffs' problems seem precisely the type for which the Legislature intended compensation.

... The trial judge here was not shocked by compensatory awards; he did not consider them excessive in view of the evidence. His determination as well as that of the jury, are entitled to considerable appellate deference.

[276 *N.J.Super.* at 440–41, 648 *A.*2d 223 (citations omitted).]

## V

Defendant asserts that the trial court erred in submitting the issue of punitive damages to the jury, contending that to sustain an award of punitive damages on this record would be tantamount to adopting a rule that punitive damages may be awarded in every case in which a violation of the LAD has been established. Defendant observes that "[t]he worst interpretation that can be placed upon defendant's actions is that he desired to avoid disruptions to his business caused by absences due to pregnancy, particularly in positions that were critical to the daily functioning of the company," arguing that such conduct does not rise to the level of willfulness, malice, or reckless disregard for consequences required to sustain an award of punitive damages.

Our case law has established two distinct conditions that must be met as prerequisites to the award of punitive damages in a discrimination suit under the LAD. The first was recently set forth in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993), to distinguish punitive damage awards from our holding that in the context of a sexual harassment claim an employer will be liable in compensatory damages for a supervisor's sexual harassment of another employee if the employer "contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct ... [or] if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment." *Id.* at 624, 626 *A.*2d 445. However, with respect to punitive-damage awards, we held that "a greater threshold than mere negligence should be applied to measure employer liability. Punitive damages are to be awarded 'when the wrongdoer's conduct is especially egregious.' Hence, the employer should be

liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Id.* at 624–25, 626 *A.*2d 445 (citation omitted).

In addition to the requirement of actual participation in or willful indifference to the wrongful conduct on the part of upper management, we also impose a requirement of proof that the offending conduct be "especially egregious." *Leimgruber v. Claridge Assocs.*, 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977). Our cases have attempted to describe conduct that is sufficiently egregious to warrant a punitive-damage award. In *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 477 *A.*2d 1224 (1984), we observed:

> To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act.
>
> ... Moreover, it is especially fitting to allow punitive damages for actions such as legal fraud, since intent rather than mere negligence is the requisite state of mind.
>
> [*Id.* at 49–50, 477 *A.*2d 1224 (citations omitted).]

Similarly, we noted in *Berg v. Reaction Motors Division*, 37 *N.J.* 396, 414, 181 *A.*2d 487 (1962): "Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." In *Herman v. Sunshine Chemical Specialties, Inc.*, 133 *N.J.* 329, 337, 627 *A.*2d 1081 (1993), we stated that proof of actual malice was "[a] condition precedent to a punitive-damages award." We also note that the Third Circuit in reviewing our LAD and punitive-damages decisions has expressed its certainty that this Court "would in some cases find that employment discrimination was wantonly reckless or malicious conduct reflecting intentional wrongdoing in the sense of an evil-minded act or a disregard of the rights of another, the type of conduct [that] it has held may justify an award of punitive damages." *Levinson v. Prentice–Hall, Inc.*, 868 *F.*2d 558, 562 (3rd Cir.1989); *see also Weiss v. Parker Hannifan Corp.*, 747

*F.Supp.* 1118, 1135 (D.N.J.1990) ("Under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact.").

■ As the Appellate Division noted, the trial court's instruction to the jury, consistent with our decisions, used the terms "actual malice ... intentional wrongdoing, and evil minded act ... wanton and willful disregard of the rights of others" in characterizing the findings required of the jury as a condition to imposing a punitive damage award. 276 *N.J.Super.* at 444, 648 *A.*2d 223. In addition, the trial court "carefully charged the jury that punitive damages could not be assessed against defendant for the acts of his employees, unless defendant himself authorized or directed them, or at least agreed with and acquiesced to them." *Ibid.*

■ We have no doubt that the proofs were sufficient to sustain a punitive-damages award. Defendant argues that at worst the evidence portrays a company desirous of avoiding the inconvenience that might result from female members of its executive staff assuming the burden of parenting a new-born child. As the Appellate Division opinion explains in detail, however, the evidence also would have permitted the jury to conclude that defendant's decision to terminate plaintiffs' employment was accompanied by conduct that was malicious and intentionally wrongful. *Id.* at 444–46, 648 *A.*2d 223. Despite unqualified promises to plaintiffs that their positions would be available on their return from disability leave, both plaintiffs were discharged within a matter of days after they had prepared to return to work. Other employees were promoted to fill their positions while plaintiffs were on leave. Moreover, the Appellate Division observed that "[t]here was ample evidence for the jury to conclude that the dismissal of Rendine for insubordination was intentionally and maliciously contrived." *Id.* at 445, 648 *A.*2d 223. Our review of the record firmly supports that inference, the evidence persuasively suggesting that the carefully orchestrated steps that prompted Rendine's confrontation with Weinerman and her resultant dismissal was developed

with defendant's full knowledge, participation, and authorization. Similarly, the jury could have concluded that defendant never had intended to permit Lorestani to return to work, and that the expressions of concern for her well being during her pregnancy were part of a strategy designed to facilitate her discharge without consequence to defendant. Significant evidence of malice and reckless misconduct permeated the record. Plaintiffs offered substantial proof not only that they had been discharged because they had become pregnant and bore children, but that defendant never had intended that they return to work after their disability leave and, through his subordinates, had embarked on a course of conduct designed to mislead plaintiffs and other company employees into believing that the company's motives and intentions were honorable and lawful. We agree with the Appellate Division's conclusion that "[t]he jury had ample evidence to support its determination that the discrimination against both plaintiffs was not only intentional wrongdoing but also malicious or 'evil-minded.'" *Id.* at 446, 648 *A.*2d 223.

## VI

Finally, we address an issue that heretofore has evaded our review but that has generated a veritable deluge of reported federal court opinions including two relatively recent United States Supreme Court decisions, as well as a generous outpouring of legal commentary. The question concerns the calculation of a "reasonable attorney's fee," payable under fee-shifting statutes such as the LAD, see *N.J.S.A.* 10:5–27.1, to the prevailing party. Specifically, we consider whether calculation of a reasonable attorney's fee under fee-shifting statutes should be limited by the "lodestar" fee—determined by multiplying the number of hours reasonably expended by the prevailing party's attorneys during the litigation by the attorneys' reasonable hourly rate—or whether a trial court properly may enhance the lodestar fee in cases in which the prevailing party's attorney's fee arrangement was predominantly contingent on a successful result, to take into account

the contingent nature of the attorney's compensation agreement in determining the statutory "reasonable attorney's fee" to be paid to the prevailing party. In addressing the issue, our primary goals are to arrive at a rule that is faithful to the Legislature's objective in enacting fee-shifting provisions, while at the same time sharply discouraging collateral litigation of "reasonable fee" issues under fee-shifting statutes by setting forth standards that inform the exercise of discretion by trial courts called on to determine such fees. Our expectation is that future fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion.

## A

We first set forth the facts relevant to the trial court's award of counsel fees. In February 1988, plaintiffs entered into a retainer agreement with their attorney, Elliot Baumgart. The agreement provided for a fee measured by the greater of (1) hourly billings at the rate of seventy-five dollars for Baumgart and sixty-two dollars and fifty cents for his associate, Ira Weiner (which amounted to fifty percent of Baumgart's and Weiner's regular billing rates), plus twenty-five percent of plaintiffs' recovery or (2) the amount of attorneys fees awarded by the court pursuant to the fee-shifting provisions of the LAD. (Baumgart subsequently merged his firm with Rabner, Allcorn and Widmark, which later became Rabner, Allcorn and Meislik, the firm that represented plaintiffs at trial.) The agreement required plaintiffs to pay a nonrefundable retainer of five thousand dollars, and to reimburse counsel for disbursements pursuant to periodic invoices. According to the post-trial certification of plaintiffs' counsel, after the retainer had been applied to the reimbursement of counsel's initial disbursements, plaintiffs were able to pay only an additional $2,750, which was applied toward counsel's additional out-of-pocket expenses. According to counsel's certification, if plaintiffs had not prevailed in the litigation they would undoubtedly have been unable to pay their attorneys' fees and disbursements as required by the agree-

ment. The certification suggests the probability that if counsel had attempted to collect the unpaid fees and disbursements plaintiffs would have sought the protection of the Bankruptcy Act. Nevertheless, counsel elected to continue the representation "on what had in reality become a completely contingent basis." The trial court agreed, characterizing counsel's arrangement with plaintiffs as "if not by design but certainly [as a matter of] practicality, on a contingent fee basis."

In support of their application for counsel fees, plaintiffs' counsel certified that after eliminating 38.95 hours of duplicative or unproductive time, their total hours expended on the litigation was 646.65, which when multiplied by the reasonable hourly rates of the participating attorneys resulted in a "lodestar" fee of $114,334.25. Counsel also sought a fee of $28,634 for postjudgment services, as well as reimbursement for out-of-pocket disbursements incurred before and after judgment.

To support the reasonableness of their lodestar fee, plaintiffs' counsel submitted certifications by several lawyers in their own firm attesting that the hourly rates used to calculate the lodestar were consistent with the standard hourly rates for the participating lawyers. In addition, plaintiffs' counsel submitted certifications from three experienced employment-law practitioners from other law firms who had provided estimates of the hours required to litigate a plaintiff's employment-discrimination case, and the estimates either exceeded or approximated the hours expended by plaintiffs' counsel. Those unaffiliated lawyers also certified that the hourly rates billed by the attorneys that had worked on the litigation appeared to be reasonable and consistent with rates charged by lawyers of comparable seniority and experience. Although defendant did not specifically challenge the reasonableness of the hourly rates used to calculate plaintiffs' counsel's lodestar fee, defendant contended that the hours expended, especially those devoted to pretrial discovery and preparation, were excessive and should be reduced significantly. The trial court concluded, however, that the total number of hours expended by plaintiffs' counsel

was reasonable, as were the hourly rates, which resulted in the trial court's acceptance of the lodestar fee of $114,334.25. The court also found reasonable counsel's prejudgment disbursements of $11,861.25.

In considering whether the award of a "reasonable attorney's fee" under the LAD warranted enhancement of plaintiffs' counsel's lodestar fee to reflect the essentially contingent nature of the counsel-fee arrangement, the trial court observed that the Rules of Professional Conduct (RPC) required consideration of several factors in determining a reasonable fee, one of which is "whether the fee is fixed or contingent." *RPC* 1.5(a)(8). Concluding that plaintiffs' fee agreement with counsel had evolved into a predominantly contingent-fee arrangement because of plaintiffs' limited resources, the court characterized the fee arrangement as one that "qualifies for possible enhancement." The trial court relied initially on Justice O'Connor's concurring opinion in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 *U.S.* 711, 107 *S.Ct.* 3078, 97 *L.Ed.*2d 585 (1987), (*Delaware Valley II* ) (four-one-four decision), which it recognized as the "holding" of the case. *See Fadhl v. City & County of San Francisco*, 859 *F.*2d 649, 650 n. 1 (9th Cir.1988) ("Justice O'Connor's concurring opinion constitutes the Court's holding in the case."). The trial court adopted two conditions for lodestar-fee enhancement set forth in Justice O'Connor's concurrence. First, "that no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Id.* at 733, 107 *S.Ct.* at 3091, 97 *L.Ed.*2d at 603 (quoting plurality opinion, 483 *U.S.* at 731, 107 *S.Ct.* at 3089, 97 *L.Ed.*2d at 601). Second, "the fee applicant bears the burden of proving the degree to which the relevant market compensates for contingency." *Id.* at 733, 107 *S.Ct.* at 3090–91, 97 *L.Ed.*2d at 603. In addition, the trial court adopted Justice O'Connor's observation that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case."

*Id.* at 731, 107 *S.Ct.* at 3089–90, 97 *L.Ed.*2d at 601. Based on those criteria, the trial court determined that plaintiffs had established their entitlement to enhancement of the lodestar fee.

In reaching that conclusion, the trial court referred to the affidavit of plaintiff Lorestani that stated that plaintiffs had telephoned ten or twelve attorneys and had met with two or three law firms, all of whom were either not interested in representing them, not qualified, or too expensive. One firm requested a retainer of $30,000. In addition, the trial court favorably referred to the certifications of three attorneys in large and mid-size law firms with responsibility for determining whether their firm should assume representation of plaintiffs in employment-discrimination cases on a contingent-fee basis. Those attorneys certified that their firms rarely accept such contingent-fee cases, and then only if the likelihood of proving liability is high, the potential damage recovery is substantial, and the firm can anticipate a fee at the conclusion of the litigation that would approximate two to two-and-one-half times the fee payable based on the hours expended multiplied by the regular hourly rates of the participating lawyers. One such attorney certified that his firm has not been accepting any plaintiff-employment discrimination cases on a contingent-fee basis, and expressed the belief that most qualified and experienced attorneys in the field had a similar policy. He expressed the view that attorneys who successfully litigate such cases on a contingent-fee basis should receive enhanced compensation. Based on plaintiff Lorestani's affidavit concerning plaintiffs' difficulty in finding counsel, the affidavits of the three unaffiliated attorneys attesting to the need for contingent-fee enhancement, and the affidavit of plaintiffs' retained expert, the trial court determined that the criteria set forth in Justice O'Connor's concurrence in *Delaware Valley II* had been satisfied. Accordingly, the trial court applied a multiplier of 2.0 to the lodestar fee of $114,334.25, resulting in a prejudgment counsel-fee award of $228,-668.50.

Defendant moved for reconsideration of the trial court's decision to enhance the lodestar fee, relying on the United States Supreme Court's decision in *City of Burlington v. Dague,* 505 *U.S.* 557, 112 *S.Ct.* 2638, 120 *L.Ed.*2d 449 (1992), decided one day before the trial court had rendered its decision on counsel fees. In *Dague,* the Court held that "enhancement for contingency is not permitted under the fee-shifting statutes at issue," 505 *U.S.* at 565–566, 112 *S.Ct.* at 2643, 120 *L.Ed.*2d at 459, but the rationale of the Court's holding apparently applies to all federal fee-shifting statutes. The trial court, however, declined to adhere to the reasoning of the Supreme Court in *Dague,* forecasting that this Court, if presented with the same issue, would adopt the reasoning of Justice Blackmun's dissenting opinion in *Dague* asserting "that a statutory fee may include additional compensation for contingency and still qualify as reasonable." *Id.* at 568, 112 *S.Ct.* at 2644, 120 *L.Ed.*2d at 460. (Blackmun, J., dissenting). Accordingly, the trial court denied defendant's motion for reconsideration of the counsel fee award.

The Appellate Division affirmed the trial court's counsel fee award, observing that

> [i]n view of the unrefuted attorneys' affidavits submitted, together with the difficulties plaintiffs had in obtaining counsel in this very case, a fee enhancement based on contingency considerations appears essential to the enforcement of the LAD.... We conclude that a liberal construction of *N.J.S.A.* 10:5–27.1, to promote the goal of ending discrimination, includes contingency fee enhancement in appropriate cases.
>
> [276 *N.J.Super.* at 458, 648 *A.*2d 223 (citations omitted).]

The Appellate Division agreed with the trial court's conclusion that the reasoning of Justice Blackmun's dissent in *Dague* was more consistent with the objectives of the LAD than was the rationale of the *Dague* majority. In addition, the Appellate Division observed that even the enhanced lodestar fee awarded by the trial court was approximately $50,000 less than the fee to which plaintiffs' attorneys were entitled under their fee agreement, calculated by multiplying the hours expended by one-half the attorneys' regular hourly rate plus twenty-five percent of the recovery. Thus, the Appellate Division explained, "the use of the

multiplier here clearly served the statutory purpose of enabling plaintiffs to obtain counsel, where plaintiffs may still be called upon to bear part of the bargained-for reasonable expense of representation." *Id.* at 461, 648 *A.*2d 223.

## B

Under the so-called "American Rule," adhered to by the federal courts and by the courts of this state, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 *U.S.* 240, 247, 95 *S.Ct.* 1612, 1616, 44 *L.Ed.*2d 141, 147 (1975); *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291, 301, 225 *A.*2d 328 (1966); *Janovsky v. American Motorists Ins. Co.,* 11 *N.J.* 1, 7, 93 *A.*2d 1 (1952); *cf. R.* 4:42–9 (setting forth specific instances in which courts are authorized to award counsel fees).

As an exception to the American Rule, Congress and the state legislatures have authorized courts pursuant to specific statutory enactments to order the losing party to pay a "reasonable" attorney's fee to the attorney for the prevailing party. Less than a decade ago over 100 separate federal fee-shifting statutes had been enacted. See *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 *U.S.* 546, 562, 106 *S.Ct.* 3088, 3096, 92 *L.Ed.*2d 439, 454 (1986), (*Delaware Valley I*). In addition to the provision of the LAD at issue here, *N.J.S.A.* 10:5–27.1, our Legislature also has passed a substantial number of statutes authorizing an award of a reasonable counsel fee to the attorney for the prevailing party. *See, e.g., N.J.S.A.* 56:8–19 (consumer-fraud actions); *N.J.S.A.* 34:19–5e (suits alleging employer-retaliatory action); *N.J.S.A.* 56:10–10 (suits alleging violations of Franchise Practices Act); *N.J.S.A.* 56:9–12a (suits alleging violations of New Jersey Antitrust Act).

In *Coleman v. Fiore Bros.,* 113 *N.J.* 594, 552 *A.*2d 141 (1989), Justice O'Hern referred to the Statement of the sponsor of 42 *U.S.C.A.* § 1988, the Civil Rights Attorney's Fee Awards Act of 1976 (Fee–Awards Act or section 1988), enacted in response to the

Supreme Court's decision in *Alyeska, supra,* to explain the rationale for the adoption of fee-shifting statutes by Congress and our State Legislature:

> "The problem of unequal access to the courts in order to vindicate congressional policies and enforce the law is not simply a problem for lawyers and courts. Encouraging adequate representation is essential if the laws of this Nation are to be enforced. Congress passes a great deal of lofty legislation promising equal rights to all.
>
> Although some of these laws can be enforced by the Justice Department or other Federal agencies, most of the responsibility for enforcement has to rest upon private citizens, who must go to court to prove a violation of law. * * * But without the availability of counsel fees, these rights exist only on paper. Private citizens must be given not only the rights to go to court, but also the legal resources. If the citizen does not have the resources, his day in court is denied him; the congressional policy [that] he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers. [122 Cong. Rec. 33,313 (1976) (Statement of Sen. Tunney).]"
>
> [*Coleman, supra.,* 113 *N.J.* at 597, 552 *A.*2d 141.]

The federal courts have developed various methodologies for determining a reasonable counsel fee pursuant to fee-shifting statutes. An early approach adopted by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 *F.*2d 714 (5th Cir.1974), advocated reliance on twelve somewhat subjective factors derived from guidelines recommended by the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson, supra,* 488 *F.*2d at 717–19.

A different, less subjective approach was adopted by the Third Circuit in *Lindy Bros. Builders v. American Radiator & Stan-*

*dard Sanitary Corp.*, 487 *F.*2d 161, 167–69 (3d Cir.1973) (*Lindy I* ). That court's methodology was first to calculate the "lodestar" fee based on the hours spent on the case multiplied by the attorneys reasonable hourly rate of compensation. That amount was then subject to adjustment on the basis of "(1) the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation and (2) the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained." *Merola v. Atlantic Richfield Co.*, 515 *F.*2d 165, 168 (3d Cir.1975); *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.*, 540 *F.*2d 102, 117 (3d Cir.1976) (*Lindy II* ).

The United States Supreme Court first addressed the question of calculating reasonable attorney's fees under fee-shifting statutes in *Hensley v. Eckerhart*, 461 *U.S.* 424, 103 *S.Ct.* 1933, 76 *L.Ed.*2d 40 (1983), in which the principal issue presented was "whether a partially prevailing plaintiff may recover an attorney's fee for legal services on unsuccessful claims." *Id.* at 426, 103 *S.Ct.* at 1935–36, 76 *L.Ed.*2d at 46. In *Hensley* the Court adopted a hybrid methodology, combining the lodestar approach of *Lindy Brothers* with the twelve-factor test endorsed in *Johnson.* The Court observed:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> [*Id.* at 433, 103 *S.Ct.* at 1939, 76 *L.Ed.*2d at 50.]

The Court noted, however, that the inquiry does not end with the lodestar fee and that other factors, including the result obtained, may induce a trial court to adjust the lodestar fee upward or downward. The Court added that "[t]he district court also may consider other factors identified in *Johnson v. Georgia Highway Express, Inc.*, [*supra*, 488 *F.*2d at 717–19], though it should note that many of these factors usually are subsumed within the initial

calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434, n. 9, 103 *S.Ct.* at 1940 n. 9, 76 *L.Ed.*2d at 51 n. 9. Concluding that "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees," *Id.* at 440, 103 *S.Ct.* at 1943, 76 *L.Ed.*2d at 54, the Court remanded the matter to the district court because its opinion "did not properly consider the relationship between the extent of success and the amount of the fee award." *Id.* at 438, 103 *S.Ct.* at 1942, 76 *L.Ed.*2d at 54. Justice Brennan sharply disagreed with the Court's decision to remand, observing that appellate courts

> should hesitate to prolong litigation over attorney's fees after the merits of a case have been concluded. * * *
>
> If a district court has articulated a fair explanation for its fee award in a given case, the court of appeals should not reverse or remand the judgment unless the award is so low as to provide clearly inadequate compensation to the attorneys on the case or so high as to constitute an unmistakable windfall.
>
> [*Id.* at 454–55, 103 *S.Ct.* at 1950, 76 *L.Ed.*2d at 64, (Brennan, J., concurring in part and dissenting in part).]

In *Blum v. Stenson*, 465 *U.S.* 886, 104 *S.Ct.* 1541, 79 *L.Ed.*2d 891 (1984), the Court considered whether an application for a counsel-fee award to a nonprofit legal-service organization under the Fee–Awards Act should be calculated on the basis of cost or prevailing market rates, and also addressed the circumstances under which an upward adjustment of the lodestar fee is permissible under section 1988. Concerning the first issue, the Court concluded that "[t]he statute and legislative history establish that 'reasonable fees' under section 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." *Id.* at 895, 104 *S.Ct.* at 1547, 79 *L.Ed.*2d at 899–900.

In respect of the district court's fifty percent upward adjustment of the lodestar fee, the Court acknowledged that circumstances might occur "in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high." *Id.* at 897, 104 *S.Ct.* at 1548, 79 *L.Ed.*2d at 901. Nevertheless, the Court observed that when "the applicant for a fee has carried his burden

of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988." *Ibid.*

Elaborating on its observation in *Hensley, supra,* that many of the so-called *Johnson* factors are subsumed within the lodestar fee, the Court held in *Blum* that the "novelty and complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" presumably are fully reflected in the lodestar amount, and thus cannot ordinarily serve as an independent basis for increasing the basic fee award. *Id.* at 898–900, 104 *S.Ct.* at 1549–50, 79 *L.Ed.*2d at 901–03. The Court added, however, that quality of representation "may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional,'" a standard not met by the award before the Court. *Id.* at 899, 104 *S.Ct.* at 1549, 79 *L.Ed.*2d at 902. Accordingly, the Court modified the district court's fee award by reinstating the lodestar-fee amount and eliminating the fifty-percent enhancement. *Id.* at 901–02, 104 *S.Ct.* at 1550, 79 *L.Ed.*2d at 903–04. The Court expressly declined to consider whether enhancement of the lodestar based on the contingent nature of counsel's representation was permissible. *Id.* at 901 n. 17, 104 *S.Ct.* at 1550 n. 17, 79 *L.Ed.*2d at 903 n. 17.

In *Delaware Valley I, supra,* the Court reversed an enhancement of the lodestar fee by a factor of two that was based on the superior quality of counsel's work and the outstanding result. The Court stated: "Because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting.'" 478 *U.S.* at 566, 106 *S.Ct.* at 3099, 92 *L.Ed.*2d at 457. The Court did not address in *Delaware Valley I* whether the lodestar fee amount could be increased to

compensate for the contingent nature of ·counsel's compensation, and restored the case to the docket for argument of that issue. *Id.* at 568, 106 *S.Ct.* at 3100, 92 *L.Ed.*2d at 458.

The Court in *Delaware Valley II*, however, was sharply divided over whether enhancement of the lodestar fee to reflect contingency was consistent with congressional intent in enacting fee-shifting statutes. The suit had been instituted to compel Pennsylvania to comply with a district court consent decree, entered pursuant to the Clean Air Act, that obligated Pennsylvania to establish inspection and maintenance programs for vehicle emission systems. Because Pennsylvania failed to comply with the consent decree, protracted litigation ensued resulting in a new deadline for commencement of the inspection and maintenance program. As the prevailing party, plaintiff sought an attorney's fee award pursuant to section 304(d) of the Clean Air Act, 42 *U.S.C.A.* § 7604(d). After dividing counsel's work into nine phases and computing the lodestar fee for each phase, the district court doubled the lodestar for three phases of the litigation to take into account the contingency of success. *Delaware Valley II, supra,* 483 *U.S.* at 714, 107 *S.Ct.* at 3081, 97 *L.Ed.*2d at 591.

Reversing the Court of Appeals for the Third Circuit which had affirmed the contingency enhancement of the fee award, 762 *F.*2d 272, 283 (3d Cir.1985), five members of the Court concluded that enhancement of the lodestar fee on the basis of contingency was improper, although on different grounds. The four Justices joining in the plurality opinion (Chief Justice Rehnquist and Justices While, Powell, and Scalia), concluded that enhancement of a statutorily authorized counsel fee to reflect contingency was inappropriate, adding that even if the Clean Air Act were construed to permit increasing the lodestar fee to reflect contingency, such enhancement would be unsupported by the record before the Court. *Id.* at 727–31, 107 *S.Ct.* at 3087–89, 97 *L.Ed.*2d at 599–601. Justice O'Connor, concurring in part and concurring in the judgment, agreed with the plurality opinion that enhancement was not warranted in this case. *Id.* at 734, 107 *S.Ct.* at 3091, 97 *L.Ed.*2d at

603. The plurality opinion based its rejection of contingency enhancement on three principal factors: First, because statutorily authorized counsel fees are limited to successful cases, contingency enhancement clashes with the legislative direction in that its effect is to compensate counsel sufficiently in successful cases to offset the economic loss sustained in unsuccessful cases; second, contingency enhancement could result in awarding the highest fees in cases least likely to succeed, which encourages the filing of high-risk cases, while simultaneously penalizing those defendants whose conduct was least culpable; and third, because all cases present some degree of risk, the plurality expressed concern that contingency enhancement would be awarded in almost all successful fee-shifting cases. *Id.* at 724–25, 107 *S.Ct.* at 3086, 97 *L.Ed.*2d at 597.

The four dissenting members (Justices Blackmun, Brennan, Marshall, and Stevens) and Justice O'Connor agreed that statutory attorney's fees may be enhanced for contingency. Responding to the plurality's concerns, the dissent emphasized that enhancement for contingency is not generally to be conditioned on the degree of risk presented by specific cases, but rather is designed "to place contingent employment *as a whole* on roughly the same economic footing as noncontingent practice." *Id.* at 745–46, 107 *S.Ct.* at 3097, 97 *L.Ed.*2d at 611 (Blackmun, J., dissenting). Justice O'Connor agreed, observing that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class,* rather than on an assessment of the 'riskiness' of any particular case." *Id.* at 731, 107 *S.Ct.* at 3089–90, 97 *L.Ed.*2d at 601. However, Justice O'Connor insisted that uniformity in the degree of enhancement for risk was essential, disagreeing with the dissent's analysis that extra enhancement for exceptional cases was permissible. *Id.* at 732–33, 107 *S.Ct.* at 3090, 97 *L.Ed.*2d at 602. In the dissent's view "the likelihood of success may appropriately be taken into account" in those unusual cases in which the risks are

so apparent and significant that they will constitute an economic disincentive independent of that created by the basic contingency in payment. When the result

achieved in such a case is significant and of broad public interest, an additional enhancement is justified in order to attract attorneys to take such cases, which otherwise might suffer from lack of representation. Extra enhancement for such cases, however, should be awarded in exceptional cases only.

[*Id.* at 751, 107 *S.Ct.* at 3100, 97 *L.Ed.*2d at 614.]

Although in *Delaware Valley II* five members of the Supreme Court concluded that contingency enhancements of a lodestar fee were permissible under fee-shifting statutes based primarily on the fact of contingency rather than its degree, that view was rejected by the Court five years later in *Dague, supra,* 505 *U.S.* 557, 112 *S.Ct.* 2638, 120 *L.Ed.*2d 449. Dague owned property adjacent to a landfill operated by the City of Burlington, and retained attorneys on a contingent-fee basis to institute suit against Burlington because of its improper operation of the landfill. The district court determined that Burlington had violated provisions of the Solid Waste Disposal Act and Federal Water Pollution Control Act, ordering Burlington to close the landfill by January 1, 1990. Concluding that Dague was a prevailing party entitled to counsel fees under those Acts, the district court calculated the lodestar fee to be $198,027.50. It then determined that that fee should be enhanced by twenty-five percent because of Dague's substantial risk of not prevailing and because in the absence of an enhanced fee Dague would have encountered difficulty in retaining counsel. The court of appeals affirmed. 935 *F.*2d 1343, 1359–60 (2d Cir.1991). The Supreme Court reversed in a six-to-three decision, holding that the fee-shifting statutes at issue did not permit enhancement of the lodestar fee on the basis of contingency, a holding that obviously applied to all federal fee-shifting statutes. See Charles Silver, *Incoherence & Irrationality in the Law of Attorneys' Fees,* 12 *Rev. Litig.* 301, 319 n. 69 (1993); 2 Mary Frances Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees* ¶ 16.04[4][b], at 16–164 to –166 (rev. ed. 1990).

The Court determined that "enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar," *id.* at 562, 112 *S.Ct.* at 2641, 120 *L.Ed.*2d at 456, observing that the difficulty of establishing the merits of a risky

claim are reflected in the lodestar fee, either by the higher number of hours required or by the higher hourly rate of the attorney skilled enough to litigate the claim. *Ibid.* The Court also expressed the concern noted by the plurality in *Delaware Valley II,* that "[t]o award a contingency enhancement under a fee-shifting statute would in effect pay for the attorney's time (or anticipated time) in cases where his client does *not* prevail." *Id.* at 563, 112 *S.Ct.* at 2643, 120 *L.Ed.*2d at 458. Finally, the Court concluded that "the interest in ready administrability that has underlain our adoption of the lodestar approach and the related interest in avoiding burdensome satellite litigation \* \* \* counsel strongly against adoption of contingency enhancement." *Id.* at 564, 112 *S.Ct.* at 2643, 120 *L.Ed.*2d at 459 (citations omitted).

Justices Blackmun, Stevens and O'Connor dissented. In her separate dissenting opinion Justice O'Connor observed:

As Justice Blackmun cogently explains, when an attorney must choose between two cases—one with a client who will pay the attorney's fees win or lose and the other who can only promise the statutory compensation if the case is successful—the attorney will choose the fee-paying client, unless the contingency-client can promise an enhancement of sufficient magnitude to justify the extra risk of nonpayment. Thus, a reasonable fee should be one that would "attract competent counsel," and in some markets this must include the assurance of a contingency enhancement if the plaintiff should prevail. I therefore dissent from the Court's holding that a "reasonable" attorney's fee can never include an enhancement for cases taken on contingency.

[*Id.* at ——, 112 *S.Ct.* at 2648, 120 *L.Ed.*2d at 465 (citations omitted).]

Although overruled by the Supreme Court's decision in *Dague,* the pre-*Dague* dispositions of the issue by federal circuit courts of appeals are nevertheless pertinent to our assessment of the propriety of contingency enhancements of lodestar fees under New Jersey's fee-shifting statutes. While the rationales were not identical and subsequent decisions in some circuits have altered earlier holdings, during the decade before the Supreme Court's 1987 decision in *Delaware Valley II,* "the federal courts [of appeals] were unanimous in awarding increased fees or in holding that the fee for contingent litigation may be increased to account for the risk that counsel will recover no fee at all." 2 Derfner & Wolf, *supra,* ¶ 16.04, at 16–155; *see, e.g., Copeland v. Marshall,*

641 *F*.2d 880, 892–93 (D.C.Cir.1980); *Wildman v. Lerner Stores Corp.*, 771 *F*.2d 605, 611–14 (1st Cir.1985); *Lewis v. Coughlin*, 801 *F*.2d 570, 575–76 (2d Cir.1986); *Hall v. Borough of Roselle*, 747 *F*.2d 838, 842–43 (3d Cir.1984); *Vaughns v. Board of Educ. of Prince George's County*, 770 *F*.2d 1244, 1245–46 (4th Cir.1985); *Graves v. Barnes*, 700 *F*.2d 220, 222–24 (5th Cir.1983); *Kelley v. Metropolitan County Bd. of Educ.*, 773 *F*.2d 677, 683–86 (6th Cir.1985), *cert. denied*, 474 *U.S.* 1083, 106 *S.Ct.* 853, 88 *L.Ed.*2d 893 (1986); *Kamberos v. GTE Automatic Elec., Inc.*, 603 *F*.2d 598, 604 (7th Cir.1979), *cert. denied*, 454 *U.S.* 1060, 102 *S.Ct.* 612, 70 *L.Ed.*2d 599 (1981); *Craik v. Minnesota State Univ. Bd.*, 738 *F*.2d 348, 350–51 (8th Cir.1984); *LaDuke v. Nelson*, 762 *F*.2d 1318, 1332–33 (9th Cir.1985), *modified*, 796 *F*.2d 309 (9th Cir.1986); *Ramos v. Lamm*, 713 *F*.2d 546, 557–58 (10th Cir.1983); *Hall v. Board of School Comm'rs.*, 707 *F*.2d 464, 465–66 (11th Cir.1983); *Crumbaker v. Merit Sys. Protection Bd.*, 781 *F*.2d 191, 196–97 (Fed.Cir.1986), *modified*, 827 *F*.2d 761 (Fed.Cir.1987). Although several of the courts of appeals apparently viewed contingency of recovery alone as a sufficient basis to warrant enhancement of the lodestar fee, a number of courts emphasized the importance of the degree of risk present in the specific case. For example, in *Lewis*, *supra*, the Court of Appeals for the Second Circuit observed:

> In and of itself, contingency is not a sufficient basis for awarding a lodestar bonus. Rather, it is the evaluation of the odds against success that ultimately determines whether an enhancement is merited. We have consistently viewed the risk of loss on the legal issues as an important consideration in any award of attorneys' fees above an hourly rate.

[801 *F*.2d at 575.]

Similarly, in *Craik*, *supra*, the Eighth Circuit, in approving a twenty-five-percent enhancement for contingency, noted:

> Counsel for plaintiffs undertook this case, which they must have known would require a massive expenditure of time and energy in the face of the very real possibility that no fee at all would be obtained. The risk here went beyond the normal contingent-fee situation. In Mr. Quiggle's case, for example, substantially all of his professional time between December 1982 and June 1983 was spent on this appeal. The investment of that much time out of one's law practice with no real hope of compensation if the appeal should prove unsuccessful is indeed a major risk, one that we think should be taken into account in setting a reasonable fee.

[738 *F*.2d at 350–51.]

The scholarly commentary on the issue, both post- and pre-*Dague*, is fairly uniform in favor of contingency enhancements of lodestar fees, with predictable variations in approach and rationale. *See, e.g.,* Silver, *supra*, 12 *Rev. Litig.* at 315 ("The argument for contingency enhancements is that they encourage lawyers to gamble. It is predictable that the lodestar method—the reigning method of calculating fees—will not have this effect without contingency enhancements because the lodestar method bases fee awards on the hourly rates lawyers charge when payment is certain.") (footnote omitted); *The Supreme Court, 1991 Term—Leading Cases*, 106 *Harv.L.Rev.* 163, 344 (1992) ("Contingency enhancements, however, are an essential component of the market. * * * Barring contingency enhancements requires lawyers to run a substantial risk of nonpayment for the same return that they receive from clients who pay in advance."); Report of the Third Circuit Task Force, *Court Awarded Attorney Fees* (Oct. 1985), *reprinted in* 108 *F.R.D.* 237, 265 (1985) ("[T]he Task Force feels that the contingency factor, which it defines simply as 'the risk of winning or losing,' *should be considered in all cases.* Plaintiffs' attorneys always face the prospect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process.") (footnote omitted); Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 *Duke L.J.* 651, 673–76; John Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 *Yale L.J.* 473, 480 (1981) ("A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions."); Samuel R. Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?* 126 *U.Pa.L.Rev.* 281, 324–26 (1977); *Developments in the Law—Class Actions*, 89 *Harv.L.Rev.* 1318, 1615–17 (1976); Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts*, 122 *U.Pa.L.Rev.* 636, 708–11 (1974); The Committee on Legal Assistance, *Committee Report: Counsel*

Fees in Public Interest Litigation, 39 Record of NYCBA 300, 317 (1984); cf. James D. Kole, Nonpayment Risk Multipliers: Incentives or Windfalls?, 53 U.Chi.L.Rev. 1074, 1106–07 (1986) (arguing for abandonment of contingency enhancements); Rochelle C. Dreyfuss, Note, Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 80 Colum.L.Rev. 346, 375 (1980) (urging that contingency factor be ignored in setting reasonable counsel fees).

## C

Aside from the careful and insightful approaches to the question afforded by the trial court's and Appellate Division's rulings, we write on a relatively clean slate in addressing the issue of contingency enhancement of lodestar fees under the LAD. Although we often have incorporated the reasoning of federal cases construing analogous federal statutes in our interpretation of the LAD, we have not been reluctant to depart from federal precedent when we determined it to be inappropriate. See Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 107, 570 A.2d 903 (1990). Nor have we previously had occasion to consider calculation of a reasonable attorneys fee under the LAD. In Singer v. State, 95 N.J. 487, 472 A.2d 138, cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984), construing the federal Fee–Awards Act, we concluded that the plaintiffs in that litigation were entitled to be considered "prevailing parties" under the Fee–Awards Act and thereby entitled to an award of a reasonable attorney's fee. Id. at 496, 472 A.2d 138. Although remanding the matter to the trial court to determine a reasonable fee, id. at 501–02, 472 A.2d 138, we referred to federal precedents construing analogous federal fee-shifting statutes to provide guidance to the trial court. We noted that the Supreme Court in Hensley, supra, 461 U.S. at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50, had confirmed that the appropriate starting point under federal law for establishing a reasonable fee is to determine the lodestar, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

*Id.* at 499, 472 *A.*2d 138. We noted that the lodestar may be adjusted upward or downward to reflect the twelve factors relied on in *Johnson, supra,* 488 *F.*2d at 717 (citing *Hughes v. Repko,* 578 *F.*2d 483 (3d Cir.1978)) to support that proposition. We characterized *Hughes* as holding that "adjustments to amount of counsel fees may be made to reflect the quality of the attorney's work, the complexity of the issues presented *and the contingent nature of success.*" *Ibid.* (emphasis added). Because we were addressing attorney's fees under the Fee–Awards Act, our reference to the appropriateness of enhancing the lodestar fee to reflect contingency did not signal any predisposition concerning that question in the context of the LAD.

Our review of the extraordinary volume of federal litigation on the question of contingency enhancements in determining a reasonable fee under federal fee-shifting statutes demonstrates the need for a clear rule, one that can readily and definitively be applied by trial courts, a rule that will end, not perpetuate, litigation of the issue. We note that in the period between the Supreme Court's decisions in *Delaware Valley II* and *Dague* some courts of appeals adopted Justice O'Connor's concurring opinion as establishing the governing standard, *see, e.g., Fadhl, supra,* 859 *F.*2d at 650 n. 1, whereas other circuit courts concluded that *Delaware Valley II* "provides no controlling legal holding." *King v. Palmer,* 950 *F.*2d 771, 784 (D.C.Cir.1991), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 3054, 120 *L.Ed.*2d 920 (1992); *Homeward Bound, Inc. v. Hissom Memorial Ctr.,* 963 *F.*2d 1352, 1358 (10th Cir.1992); *see also Dague, supra,* 935 *F.*2d at 1360 (recognizing "the anomaly of the views of one justice, with whom no one concurs, being the law of the land, where the Court is so divided on an issue and where there is no majority opinion at all"), *rev'd,* 505 *U.S.* ——, 112 *S.Ct.* 2638, 120 *L.Ed.*2d 449 (1992). Our objectives in this murky area of counsel-fee awards are clarity, simplicity, and finality, to the extent they are attainable.

■ Under the LAD and other state fee-shifting statutes, the first step in the fee-setting process is to determine the "lodestar":

the number of hours reasonably expended multiplied by a reasonable hourly rate. In our view, the trial court's determination of the lodestar amount is the most significant element in the award of a reasonable fee because that function requires the trial court to evaluate carefully and critically the aggregate hours and specific · hourly rates advanced by counsel for the prevailing party to support the fee application. Trial court's should not accept passively the submissions of counsel to support the lodestar amount:

> Compiling raw totals of hours spent, however, does not complete the inquiry. It does not follow that the amount of time *actually* expended is the amount of time *reasonably* expended. In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority. Thus, no compensation is due for nonproductive time. For example, where three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time.
>
> [*Copeland, supra,* 641 *F.*2d at 891.]

The Court of Appeals for the Third Circuit made the following observations about the proposed lodestar:

> The district court should exclude hours that are not reasonably expended. Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary. Further, the court can reduce the hours claimed by the number of hours "spent litigating claims on which the party did not succeed and that were 'distinct in all respects from' claims on which the party did succeed." *Institutionalized Juveniles [v. Secretary of Pub. Welfare,* 758 *F.*2d 897, 919 (3d Cir.1985) ] (quoting *Hensley,* 461 *U.S.* at 440, 103 *S.Ct.* at 1943). The court also can deduct hours when the fee petition inadequately documents the hours claimed.
>
> [*Rode v. Dellarciprete,* 892 *F.*2d 1177, 1183 (3d Cir.1990) (citations omitted).]

██ Concerning the trial court's obligation to exclude from the proposed lodestar calculation hours not reasonably expended by the prevailing party's attorney, we consider in *Szczepanski v. Newcomb Medical Center,* 141 *N.J.* 346, 661 *A.*2d 1232 (1995), also decided today, the question whether and to what extent in awarding counsel fees under state fee-shifting statutes a trial court should take into account the relationship between the damages recovered and the hours expended. In *City of Riverside v. Rivera,* 477 *U.S.* 561, 106 *S.Ct.* 2686, 91 *L.Ed.*2d 466 (1986), a plurality of the Supreme Court upheld a counsel-fee award of $245,456.25 in a suit alleging civil-rights violations in which the

plaintiffs had been awarded compensatory and punitive damages of $33,350. The plurality opinion concluded that although damages recovered were a factor bearing on the reasonableness of counsel fee awards, federal fee-shifting statutes did not require proportionality . between damage recoveries and counsel-fee awards, observing that "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *Id.* at 574, 106 *S.Ct.* at 2694, 91 *L.Ed.*2d at 479. Although Justice Rehnquist's dissent did not reject the principle underlying the plurality opinion's holding, it concluded that "this case shares none of the special aspects of certain civil rights litigation which the plurality suggests ... would justify an award of attorney's fees totally divorced from the amount of damages awarded by the jury." *Id.* at 595, 106 *S.Ct.* at 2704, 91 *L.Ed.*2d at 492. Our view of the issue is substantially in accord with the analysis set forth in Justice Brennan's plurality opinion. Nevertheless, if the specific circumstances incidental to a counsel-fee application demonstrate that the hours expended, taking into account the damages prospectively recoverable, the interests to be vindicated, and the underlying statutory objectives, exceed those that competent counsel reasonably would have expended to achieve a comparable result, a trial court may exercise its discretion to exclude excessive hours from the lodestar calculation.

■ Similarly, a trial court should reduce the lodestar fee if the level of success achieved in the litigation is limited as compared to the relief sought. "If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley, supra,* 461 *U.S.* at 436, 103 *S.Ct.* at 1941, 76 *L.Ed.*2d at 52; *see, e.g., Scales v. J.C. Bradford & Co.,* 925 *F.*2d 901, 910 (6th Cir.1991) (reducing lodestar by forty-five percent to reflect plaintiff's partial success).

■ In addition, the attorney's presentation of billable hours should be set forth in sufficient detail to permit the trial court to ascertain the manner in which the billable hours were divided among the various counsel:

> To this end the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys. It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the hours devoted to various general activities, *e.g.*, pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, *e.g.*, senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought.
>
> [*Lindy I, supra*, 487 *F*.2d at 167.]

■ The trial court must then determine whether the assigned hourly rates for the participating attorneys are reasonable:

> Generally, a reasonable hourly rate is to be calculated according to the prevailing market rates in the relevant community. Thus, the court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.
>
> [*Rode, supra*, 892 *F*.2d at 1183 (citation omitted).]

That determination need not be unnecessarily complex or protracted, but the trial court should satisfy itself that the assigned hourly rates are fair, realistic, and accurate, or should make appropriate adjustments. To take into account delay in payment, the hourly rate at which compensation is to be awarded should be based on current rates rather than those in effect when the services were performed. *See Delaware Valley II*, 483 *U.S.* at 716, 107 *S.Ct.* at 3082, 97 *L.Ed.*2d at 592 ("In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.") (plurality opinion); *Ramos, supra*, 713 *F*.2d at 555.

■ We hold that the trial court, after having carefully established the amount of the lodestar fee, should consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome. We understand and

carefully have evaluated the various objections advanced to contingency enhancements, including the often-repeated admonition that "[t]hese statues were not designed as a form of economic relief to improve the financial lot of [attorneys]." *Dague, supra,* 505 *U.S.* at 563, 112 *S.Ct.* at 2642, 120 *L.Ed.*2d at 457 (quoting *Delaware Valley I, supra,* 478 *U.S.* at 565, 106 *S.Ct.* at 3098, 92 *L.Ed.*2d at 456). Both as a matter of economic reality and simple fairness, we have concluded that a counsel fee awarded under a fee-shifting statute cannot be "reasonable" unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed. The reasoning underlying our holding often has been explained, and most effectively in simple terms. As the late Judge Charles Wyzanski once observed:

> No one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.
>
> [*Cherner v. Transitron Elec. Corp.,* 221 *F.Supp.* 55, 61 (D.Mass.1963).]

*See also Blum, supra,* 465 *U.S.* at 903, 104 *S.Ct.* at 1551, 79 *L.Ed.*2d at 905 ("Lawyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, irrespective of whether they win or lose.") (Brennan, J., concurring); Berger, *supra,* 126 *U.Pa.L.Rev.* at 324–25 ("The experience of the marketplace indicates that lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk."); 2 Derfner & Wolf, *supra,* ¶ 15.01[2][c], at 15–16 ("Most courts realize that where payment of a fee is contingent on success an attorney should receive a larger overall fee than where payment is guaranteed regardless of outcome....") (footnote omitted).

We are unpersuaded by Justice Scalia's suggestion in *Dague, supra,* that awarding contingency enhancement under a fee-shifting statute "would in effect pay for the attorney's time (or

anticipated time) in cases where his client does *not* prevail." 505
*U.S.* at 565, 112 *S.Ct.* at 2643, 120 *L.Ed.*2d at 458. In our view the
case for contingency enhancement

> has nothing to do with the amount of time lawyers invest in losing cases. It rests
> on the desire to enable parties to compete for legal services in the private market.
> In that market, parties who can offer only fee awards contend with parties who can
> offer certain hourly payments and with parties who can offer contingent percentage
> fees from damage awards. To bid for services effectively, parties with only fee
> awards to offer must be able to pay market rates. They cannot do that when they
> are denied contingency enhancements because they cannot cover the nonpayment
> risk. A lawyer given a choice between an unenhanced hourly rate in a fee award
> case and an equal rate in a case where payment is certain will have a strong
> incentive to decline the fee award case.
>
> [Silver, *supra,* 12 *Rev. Litig.* at 331–32 (footnote omitted).]

We acknowledge the concerns about overpayment and
double-counting expressed in *Dague, supra,* 505 *U.S.* at 562–563,
112 *S.Ct.* at 2641–42, 120 *L.Ed.*2d at 456–57, and *Delaware Valley
II,* 483 *U.S.* at 726–27, 107 *S.Ct.* at 3087, 97 *L.Ed.*2d at 598, and
address those concerns by the standards that we adopt to guide
the award of contingency enhancements. Those standards will
serve as limits on the amount of contingency enhancements and
will require a relationship between the amount of the enhance-
ment awarded and the extent of the risk of nonpayment assumed
by counsel for the prevailing party. In that respect, we do not
adopt the view espoused in Justice O'Connor's concurrence in
*Delaware Valley II* that "a court should not award any enhance-
ment based on 'legal' risks or risks peculiar to the case," 483 *U.S.*
at 734, 107 *S.Ct.* at 3091, 97 *L.Ed.*2d at 603, which rests on the
assumption that *all* contingent-fee cases should be treated as a
class, without distinction based on their specific circumstances.
We think the more practical approach is that outlined in the
*Delaware Valley II* dissent, which observes that "a court's job
simply will be to determine whether a case was taken on a
contingent basis, whether the attorney was able to mitigate the
risk of nonpayment in any way, and whether other economic risks
were aggravated by the contingency of payment," and notes that
" 'it is the actual risks or burdens that are borne by the lawyer or
lawyers that determine whether an upward adjustment is called

for.'" 483 *U.S.* at 747, 107 *S.Ct.* at 3098, 97 *L.Ed.*2d at 612 (Blackmun, J., dissenting) (quoting *Wildman, supra,* 771 *F.*2d at 613).

As the American Bar Association advocated in its brief in *Delaware Valley II,* "[i]n adjudicating claims of enhancement, therefore, courts should evaluate both the extent to which the attorney has been able to mitigate the basic risk of nonpayment and the extent to which other factors may have aggravated it." Brief for American Bar Association as *Amicus Curiae* at 19. Thus, attorneys who are paid a portion of their reasonable hourly fee irrespective of result have partially mitigated the risk of nonpayment. Similarly, "[a]n attorney who has entered into a contingent fee contract in a suit seeking substantial damages has also significantly reduced his risk, for he has obtained, in exchange for his acceptance of the risk of nonpayment, the prospect of compensation greater than the prospective 'lodestar' amount." *Id.* at 20. Nevertheless, even in cases in which an attorney has negotiated a contingent-fee payment, the risk of nonpayment might remain substantial because of the specific problems of proof and the hazards inherent in all litigation. Moreover, in a wide variety of fee-shifting cases attorneys will be unable to mitigate the risk of nonpayment.

> In many cases, a client will be unable to pay for counsel or will be unwilling to assume the risk of liability for attorney's fees, even if the public interest may be significantly aided by the private litigation. Other cases simply will not generate significant funds, even if they are successful. Many actions seek only declaratory or injunctive relief, many are hampered by immunity doctrines and special defenses available to the defendants, and many will generate only small awards.
>
> [*Delaware Valley II, supra,* 483 *U.S.* at 749, 107 *S.Ct.* at 3099, 97 *L.Ed.*2d at 613 (Blackmun, J., dissenting).]

Although we authorize the award of contingency enhancements based on the risk of nonpayment, that principle does not preclude a trial court, in exercising its discretion to award a reasonable attorney's fee, from also taking into account in certain cases the likelihood of success.

> Sometimes, the "legal" risks facing a case may be so apparent and significant that they will constitute an economic disincentive independent of that created by the

basic contingency in payment. When the result achieved in such a case is significant and of broad public interest, an additional enhancement is justified in order to attract attorneys to take such cases, which otherwise might suffer from lack of representation. Extra enhancement for such cases, however, should be awarded in exceptional cases only.

[*Id.* at 751, 107 *S.Ct.* at 3100, 97 *L.Ed.*2d at 614 (Blackmun, J., dissenting).]

Similarly, in cases in which the likelihood of success is unusually strong, a court may properly consider the inherent strength of the prevailing party's claim in determining the amount of contingency enhancement. *Cf. Hall, supra,* 747 *F.*2d at 843–44 ("[O]ne can fairly conclude that from the outset the plaintiff had a very strong case and 'objectively viewed, the risk that plaintiff['s] counsel would come away empty handed was remote.' ") (quoting *McMullan v. Thornburgh,* 570 *F.Supp.* 1070, 1076 (E.D.Pa.1983)).

We decline to adopt the condition on the award of contingency enhancements advocated by the plurality opinion in *Delaware Valley II* that there be "evidence in the record * * * that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." 483 *U.S.* at 731, 107 *S.Ct.* at 3089, 97 *L.Ed.*2d at 601 (plurality opinion). We find the condition insufficiently related to the primary rationale for contingency enhancements, which is to assure that counsel for the prevailing party is paid a *reasonable* fee by the nonprevailing party. Whether counsel is readily available to a plaintiff by virtue of the prospect of receiving a substantial contingent fee out of the recovery, or difficult to retain because the claim seeks only equitable relief, the justification for enhancement is the same: The recognition that in either case the lodestar amount is not a *reasonable* fee to be charged to the nonprevailing party because it does not reflect the risk of nonpayment. The Bar's knowledge that contingency enhancements are awarded in litigation instituted under fee-shifting statutes surely will increase the availability of attorneys to prosecute those claims, but proof by a plaintiff of difficulty in hiring an attorney is not and should not be a prerequisite to contingency enhancement under New Jersey's fee-shifting statutes.

Determination of the amount by which a lodestar fee should be enhanced to reflect the risk of nonpayment is conceptually difficult because there is "no such thing as a market hourly rate in contingent litigation." 2 Derfner & Wolf, *supra,* ¶ 16.04[4][a], at 16–153. We note that plaintiffs' application for counsel fees relied in part on certifications from three attorneys specializing in employment-discrimination cases who stated that contingency enhancements of two to two-and-one-half times the lodestar is required to induce competent attorneys to undertake to represent plaintiffs in comparable cases. We are skeptical about whether the size of contingency enhancements can responsibly be predicated solely on the certifications of attorneys who practice in the field, and note that other courts have arrived at the same conclusion. *Cf. Kelly v. Matlack, Inc.,* 903 *F.*2d 978, 986–87 (3d Cir. 1990) (affirming trial court's determination to deny contingency enhancement despite submission of eight attorney affidavits advocating doubling of lodestar); *Rode, supra,* 892 *F.*2d at 1184–85 (rejecting attorney affidavits submitted to support fee application as insufficient to establish relevant market's treatment of contingency cases); *Blum v. Witco Chem. Corp.,* 888 *F.*2d 975, 983–84 (3d Cir.1989) (confirming district court's conclusion that eight attorney affidavits supporting contingency enhancement were inadequate to quantify amount by which lodestar fee should be increased).

We also discern from our review of the extensive litigation concerning contingency enhancements that fee awards of double the lodestar represent the high end of attorney fee awards under fee-shifting statutes:

Before the Supreme Court began to address contingent multipliers, the size of contingency enhancements varied both according to the type of litigation and the degree of risk involved in the individual lawsuit. Although the lower courts' tendency to fail to spell out precisely how much of a fee enhancement was due to contingency and how much to other factors makes any breakdown inherently imprecise, a total multiplier of 2, representing all enhancing factors, appears typically to have been applied as a ceiling in public interest litigation, *see, e.g., Kelley v. Metropolitan County Board of Educ.,* 773 F.2d 677 (6th Cir.1985) (en banc) *cert. denied,* 474 *U.S.* 1083, 106 *S.Ct.* 853, 88 L.Ed.2d 893 (1986) (multiplier of 1.25 for contingency); *Vaughns v. Board of Educ. of Prince George's County,* 770

F.2d 1244 (4th Cir.1985) (multiplier of 1.075 for contingency); *Sierra Club v. Clark*, 755 F.2d 608 (9th Cir. [8th Cir.] 1985) (multiplier of 1.3 for contingency, difficulty and results); *Craik v. Minnesota State Univ. Board*, 738 F.2d 348 (8th Cir.1984) (multiplier of 1.25 for contingency)....

[2 Derfner & Wolf, *supra*, ¶ 16.04[4][a], at 16–157 n. 151.]

The American Bar Association expressed a similar view concerning the size of contingency enhancements:

Further, the degree of enhancement actually awarded by the courts in civil rights case has been far from extravagant. Of the 26 post-*Blum v. Stenson* cases awarding risk-based enhancement under Section 1988 discussed in the preceding paragraph, enhancement of 100% is the maximum reported, and the unweighted average of all enhancement factors employed was only approximately 32%. Similarly, in *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 613 (1st Cir.1985), the First Circuit observed that during 1980–1985, for civil rights cases, enhancement of 100% was the maximum reported, and that enhancements of such magnitude had been awarded only three times.

[Brief for American Bar Association as *Amicus Curiae, supra*, at 17.]

■ We conclude that contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar. Such enhancements should never exceed one-hundred percent of the lodestar, and an enhancement of that size will be appropriate only in the rare and exceptional case in which the risk of nonpayment has not been mitigated at all, *i.e.*, where the "legal" risk constitutes "an economic disincentive independent of that created by the basic contingency in payment * * * [and] the result achieved * * * is significant and of broad public interest." *Delaware Valley II, supra*, 483 *U.S.* at 751, 107 *S.Ct.* at 3100, 97 *L.Ed.*2d at 614 (Blackmun, J., dissenting). Enhancements of that magnitude will be reserved for cases of that description in which no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award, and in which the relief sought was primarily equitable in nature. Obviously, we remain willing to revisit the issue if presented with compelling evidence that our perception of the proper range of contingency enhancements is inconsistent with the relevant market and there-

fore is obstructing the availability of competent counsel to conduct fee-shifting litigation.

Our desire to avoid ancillary litigation over counsel-fee awards prompts us to exercise our original jurisdiction and modify the counsel-fee award fixed by the trial court, which was made without the benefit of the guidelines established in this opinion. On this record, defendant having asserted only a generalized challenge, in the course of argument on the application for counsel fees, to the number of hours expended by plaintiffs' counsel in pretrial preparation and discovery, we accept the trial court's determination that the lodestar fee is reasonable. In view of the substantial verdict recovered by plaintiffs, no question exists about whether the level of success achieved is sufficient to warrant an award of the entire lodestar fee amount. See *Hensley, supra,* 461 *U.S.* at 435–36, 103 *S.Ct.* at 1940–41, 76 *L.Ed.*2d at 52. The guidelines we have adopted, however, suggest that the fee award of double the lodestar—representing a contingency enhancement of one hundred percent of the lodestar—is excessive. As the Appellate Division noted, the partially contingent-fee agreement between plaintiffs and counsel "provided for compensation of about $278,207 for the services rendered by counsel before judgment. (This is 25% of the recovery of $935,000 plus an hourly-rate calculation based on 50% of the median rate, or $68.75 per hour for partners and associates, times 646.65 hours.)" 276 *N.J.Super.* at 460, 648 *A.*2d 223. Pursuant to that agreement, although counsel would have borne the practical risk of nonpayment because of plaintiffs' limited financial resources if the suit had been unsuccessful, that risk was somewhat offset by the prospect of substantial compensation, independent of the court-awarded fee, in the event of a large recovery. In addition, without diminishing the burdens borne by plaintiffs' counsel in overcoming a vigorous defense and persuading the jury to award substantial compensatory and punitive damages, our assessment of the record, consistent with those of the trial court and Appellate Division, is that strong evidence supported the jury's finding that unlawful discrimination

was a contributing factor in the termination of Rendine and Lorestani, which suggests that the risk of nonpayment was also somewhat mitigated by the strength of plaintiffs' case. "The jury had ample evidence to support its determination that the discrimination against both plaintiffs was not only intentional wrongdoing but also malicious or 'evil-minded.' " *Id.* at 446, 648 *A.*2d 223.

Although we assess plaintiffs' counsel's risk of nonpayment as moderate, that risk increased during the course of the litigation by virtue of defendant's vigorous resistance to each element of plaintiffs' claims. We lack the intimate familiarity with the record and feel for the case possessed by the trial court. Nevertheless, based on our careful review of the trial record we have concluded that a contingency enhancement equal to one-third of the lodestar fee, or $38,111.42, is appropriate. We therefore modify the judgment and reduce the prejudgment counsel-fee award from $228,668.50 to $152,445.67. Based on the Appellate Division's calculation that plaintiffs' counsel are entitled to a fee of $278,207 pursuant to their contingent-fee agreement, our modification of the judgment apparently will increase plaintiff's obligation for prejudgment counsel fees from $49,538.50 to $125,761.33.

Although the adoption of guidelines for determining reasonable counsel fees mandated our intervention to modify the fee set by the trial court, we reiterate our assumption that in the future the need for appellate supervision of counsel-fee awards under fee-shifting statutes will be infrequent.

### D

Defendant's amended Petition for Certification encompassed the Appellate Division's order entered September 7, 1994, awarding counsel fees, costs, and disbursements on appeal. By virtue of our grant of the petition, defendant's challenge to the Appellate Division's order is before us. We decline to disturb that order in any respect.

## VII

Except for the modification of the counsel-fee award, we affirm the judgment of the Appellate Division.

*For modification and affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.