**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4423-18T3

K.M.L. (n/k/a K.M.Z.),

    Plaintiff-Respondent,

v.

R.J.L.,

    Defendant-Appellant.

_____

Submitted September 16, 2020 – Decided October 8, 2020

Before Judges Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-1345-15.

Stolfe Zeigler, attorneys for appellant (Abigale M. Stolfe and Valerie W. Voreis, on the briefs).

Matthew R. Abatemarco, Esq., LLC, attorneys for respondent (Gregory B. Thomlison, on the brief).

PER CURIAM

In this divorce proceeding, defendant R.J.L.[1] appeals from the custody, equitable division, debt allocation, child support, and counsel fee award aspects of an April 26, 2019 final judgment of divorce (FJOD) that was entered following a two-day default hearing conducted after defendant's answer and counterclaim were stricken. We affirm in part and vacate and remand in part.

We derive the following facts from the record. Plaintiff K.M.Z. (formerly known as K.M.L.) and defendant were married in May 2007. Plaintiff is a Certified Public Accountant. Defendant is a ship/yacht captain who runs trips in Florida and the Caribbean during the winter and until June, then returns and runs trips in the Northeast.

In July 2010, the parties had their only child, C.L., who is autistic and suffers from Attention Deficit Hyperactivity Disorder, Expressive Communication Disorder, unspecified Disturbance of Conduct, and Post-Traumatic Stress Disorder that require multiple medications and significant therapy. He attends a special needs school and receives treatment from several medical professionals.

---

[1] We identify the parties and their son by initials to protect their privacy. R. 1:38-3(d)(3).

Plaintiff left the marital home in January 2015 and obtained a Temporary Restraining Order (TRO) against defendant under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, which was later dismissed in favor of a January 28, 2015 civil restraints agreement. On May 7, 2015, plaintiff filed for divorce. Soon thereafter, defendant moved to Florida where the record indicates he still resides. Defendant did not file an answer in the divorce action, leading to the entry of a July 13, 2015 order of default against him. On September 29, 2015, the default was vacated after defendant entered an appearance. In October 2016, Defendant subsequently filed an answer and five-count counterclaim.[2]

Meanwhile, in May 2015, plaintiff obtained a second domestic violence TRO against defendant that was also later dismissed in favor of civil restraints. In August 2015, plaintiff obtained a third domestic violence TRO against defendant which he later consented to converting to a final restraining order.

Following a status conference on May 10, 2018, the court entered an order that stated: "The defendant has failed to cooperate with the Custody Neutral Evaluation (CNA) . . . which was ordered more than one (1) year ago."

---

[2] Counts one and three alleged causes of action for divorce. Count two alleged frivolous litigation. Count four alleged negligent passage of a venereal disease. Count five sought punitive damages.

The order further stated: "If defendant intends on calling any type of expert with regard to custody [or] parental alienation, he is to hire such expert and provide a report to the [c]ourt and the [p]laintiff's attorney at least thirty (30) days prior to the trial date in August."

The court noted that its review of the file "does not indicate that the [d]efendant has complied with previous [o]rders with regard to either a psychological [or] psychiatric evaluation." The order also noted defendant was served in court with the requests for admission propounded by plaintiff and directed him to answer the requests within thirty days of the date of the order or they will be deemed admitted.

After several years of contentious litigation, a trial adjournment due to a conflicting surgery defendant scheduled, and a Division of Child Permanency and Placement investigation, the trial court conducted the final pre-trial conference and entered a July 9, 2018 order that scheduled trial for August 7 to August 8, 2018. It provided the date was set with the consent of both parties and "shall be considered a firm date. No request for an adjournment shall be entertained absent showing of exceptional circumstances." By this point, defendant had dismissed several attorneys and was proceeding pro se.

4

The judge also directed the parties to submit a pre-trial memorandum "with legal analysis and documentation including pre-marked exhibits" at least seven days before trial. He included the following language in the order: "[a]ll expert reports and discovery to be used in the trial hav[e] already been produced except for the [CNA], which is still pending." The judge put the parties on notice that "[f]ailure to comply with this [o]rder may result in sanctions and dismissal of pleadings."

The trial date was again adjourned at defendant's request because he claimed he did not have sufficient funds to travel from Florida to New Jersey as a result of losing his job in early June 2018. During an additional August 3, 2018 conference, the court re-listed the trial for a peremptory date of October 22 to October 25, 2018, beginning at 9:00 a.m., and advised defendant that "should he choose not to appear, the court would entertain an application by [plaintiff] to strike the [d]efendant's pleadings and proceed by way of default." Defendant acknowledged under oath that he fully understood the court's position. The court reiterated that failure to comply with the July 9, 2018 order or this order "may result in sanctions and dismissal of pleadings."

Defendant did not appear on time for trial. After waiting thirty-five minutes, the court called defendant, who explained that he had "just gotten to

5

New Jersey." Defendant informed the court that he would be arriving in thirty minutes and that he desired another adjournment to obtain an attorney.

Defendant arrived in court some forty minutes later. After briefly addressing the issue of retaining counsel, he went off on a tangent and made various accusations against plaintiff. In response, plaintiff moved to strike the defendant's pleadings and to proceed by way of default. Plaintiff noted that defendant "was aware that the trial dates were peremptory" and that the court had the power to strike defendant's pleadings if he was not ready to proceed with trial. Additionally, plaintiff noted defendant's failure to respond to plaintiff's requests for admissions—served on him three separate occasions— would lead to "a trial by ambush as [p]laintiff has no idea what [d]efendant will attempt to argue."

This led to the trial court entering an October 24, 2018 order striking defendant's pleadings, permitting plaintiff to file a notice of proposed final judgment pursuant to Rule 5:5-10,[3] and allowing the matter to proceed to default. The court then scheduled the default hearing for December 5, 2018.

---

[3] Rule 5:5-10 provides that "[i]n those cases where equitable distribution, alimony, child support and other relief are sought and a default has been entered, the plaintiff shall file and serve . . . a Notice of Proposed Final Judgment" at least twenty days before the hearing that sets forth:

On December 4, 2018, the court conducted a pre-hearing conference concerning defendant's request for adjournment of the default hearing. During the conference, defendant claimed he had not received the notice of proposed final judgment[4] and was unable to attend the hearing the next day. He also inappropriately informed the judge that she "needed to pick different courses at Judicial College" concerning family law and referred to plaintiff's attorney in a derogatory fashion. The court determined there was insufficient time allotted for the default hearing that would require a full day. It directed plaintiff to re-serve defendant with the notice of proposed final judgment and re-scheduled the default hearing for January 31, 2019.

On December 31, 2018, defendant's newly retained counsel moved to: (1) vacate default; (2) accept defendant's witness list; (3) accept defendant's

---

the proposed trial date, a statement of the value of each asset and the amount of each debt sought to be distributed and a proposal for distribution, a statement as to whether plaintiff is seeking alimony [or] child support and, if so, in what amount, and a statement of all other relief sought, including a proposed parenting time schedule where applicable.

[4] Plaintiff's counsel provided the court with a certification of service contrary evidence indicating that the notice of proposed final judgment was sent to defendant by certified mail, return receipt requested, as well as regular mail. The certified mail was not signed for and returned. The regular mail was not returned as undeliverable.

7

trial exhibit list; and (4) appoint a limited guardian to assist defendant in making trial decisions due to his alleged longstanding psychiatric issues. On January 24, 2019, the court accepted defendant's witness and exhibit lists but denied his request to vacate default and to appoint a guardian ad litem.

The two-day default hearing took place in January and February 2019. Both parties appeared with counsel and testified. Defendant also called his mother as a witness. On March 22, 2019, the court issued a comprehensive sixty-three-page default hearing decision. Pertinent to this appeal, the court: (1) awarded plaintiff sole legal and residential custody of C.L.; (2) set defendant's child support obligation at $183 per week; and (3) awarded plaintiff certain credits for counsel fees and marital property. The court denied plaintiff's request for limited duration alimony. The decision was embodied in an April 26, 2019 final judgment of divorce. This appeal followed.

Defendant argues the trial court erred by: (1) failing to vacate defendant's default; (2) failing to award joint legal custody of the minor child; (3) failing to consider the best interests of the child; (4) failing to evenly divide the parties' retirement account; (5) failing to award defendant a credit toward his child support obligation for maintaining health insurance for the

A-4423-18T3

benefit of the minor child; and (6) failing to accept evidence of defendant's missing Rolex watches.

Our review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). Reviewing courts "accord particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 412). Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Courts will not disturb the factual findings and legal conclusions unless convinced they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015)).

"Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred." Ibid. (citing Gac v. Gac, 186 N.J. 535, 547 (2006)). An abuse of discretion occurs when a trial court makes "findings inconsistent with or unsupported by competent

9

evidence," utilizes "irrelevant or inappropriate factors," or "fail[s] to consider controlling legal principles." Elrom, 439 N.J. Super. at 434 (citations and quotations omitted). An abuse of discretion can also be found if the court "fails to take into consideration all relevant factors[,] and when its decision reflects a clear error in judgment." State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017) (quoting State v. Baynes, 148 N.J. 434, 444 (1997)).

Reviewing courts do not accord special deference to the Family Part's interpretation of the law, D.W. v. R.W., 212 N.J. 232, 245 (2012) (citation omitted), and review legal determinations de novo. Ricci, 448 N.J. Super. at 565 (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

## A.

Defendant argues that the trial court's "refusal to vacate default was a mistaken exercise of discretion." While acknowledging that the case was several years old, he claims there was little prejudice to plaintiff in vacating default that could not have been cured by awarding counsel fees. Defendant also asserts that due to the default he "was precluded from asserting any affirmative requests for relief, greatly prejudicing him especially in connection with his requests for joint legal custody and parenting time with his young son." We are unpersuaded by this argument.

10

A trial court may vacate the entry of default upon "good cause shown." R. 4:43-3. "Good cause" as used in this rule means "the presence of a meritorious defense . . . and the absence of any contumacious conduct."[5] O'Connor v. Altus, 67 N.J. 106, 129 (1975). We review the denial of a motion to vacate default for abuse of discretion. U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012).

When it entered default, the trial court explained that defendant

> has intentionally prolonged the litigation unnecessarily and in bad faith. Moreover, in complete disregard of all prior [c]ourt [o]rders, [d]efendant has chosen to conduct this litigation as he believes that same should be conducted. The [c]ourt indicated in prior [o]rders that, should the parties not comply with the provisions therein, that the parties could be subject to sanctions or a dismissal of their pleadings. The [c]ourt could no longer countenance [d]efendant's disregard for the Rules of Court. The [c]ourt was convinced that [d]efendant understood that the trial dates for October were firm dates and that the request for an adjournment served only to further prolong the litigation. The [c]ourt was also convinced that [d]efendant had notice of and understood that the [c]ourt would consider this remedy if he either failed to appear or was not prepared to go forward on the date of trial.

---

[5] Defendant states that a "'meritorious defense' is hard to apply to a divorce matter," and does not address it.

Defendant subsequently retained new counsel and moved to vacate the entry of default. The trial court denied the motion and held the entry of default was appropriate based on its findings, because defendant provided no additional information that would warrant reconsideration.

When determining whether good cause exists, the trial court generally considers the movant's "absence of any contumacious conduct." O'Connor, 67 N.J. at 129. Here, the judge found defendant "intentionally prolonged the litigation unnecessarily and in bad faith" and continuously disregarded the court rules. Moreover, defendant acknowledged under oath that he understood he would be required to be prepared for trial on October 22, 2018. Instead, he arrived nearly two hours late and requested a third adjournment to retain counsel after dismissing several previous attorneys. This clearly impacted judicial efficiency and economy.

Defendant's conduct also prejudiced plaintiff. Defendant did not timely respond to requests for admission or supply requested documents. His failure to provide discovery thwarted plaintiff's ability to accurately determine his income, including the rental income he received. Defendant also provided no financial information regarding RJL Yachts. These deficiencies led to plaintiff filing multiple enforcement applications, increasing her legal fees.

When defendant ultimately submitted a self-prepared Case Information Statement on the eve of trial. In addition to being woefully late, it was of limited time frame. Defendant's witness list included five witnesses: defendant, plaintiff, defendant's mother, and defendant's brother Vincent. Notably, defendant did not list any experts. His exhibit list included a psychological report and the CNA.

An August 3, 2018 CNA was prepared by Sean R. Evers, Ph.D. It noted that C.L. is treated by a pediatrician, developmental pediatrician, psychiatrist, psychologist, and neurologist. C.L. also has an Applied Behavioral Analysis technician, a social worker, and a case manager. His therapy and treatment include weekly psychologist appointments, semi-annual developmental pediatrician visits, monthly psychiatrist visits, nine hours of autism therapy per week, and weekly neurofeedback sessions. C.L.'s medications were listed as Ritalin, Depakote, Abilify, Remeron, Guanfacine ER, and Seroquel.

The CNA noted C.L.'s need "for consistency in his life" and "the various treatments he receives." Dr. Evers concluded the parties "have not shown any ability to communicate productively with each other," which is "a basic requirement in any shared custody/parenting time arrangement" that "is made even more critical when [C.L.'s] condition is factored in."

Dr. Evers found that while plaintiff "presented a thorough and granular understanding of her son's needs," defendant "does not appear to fully understand [C.L.'s] condition and the importance of consistency and predictability for him." Dr. Evers opined that C.L.'s "need for a consistent environment precludes a flexible approach to parenting time" and that defendant "should consider entering individual therapy to help him better understand his son's needs and limitations."

An August 3, 2018 psychological evaluation report noted defendant "presented with an unusual number of psychological symptoms which may be an indication that he was exaggerating the extent of his current problems." The report further noted defendant "has acknowledged the extent of his wrongdoings and fully understands the negative impact it had (and continues to have) on both his wife and son. He also understands that his inability to contain his anger problems served as the primary reason why both family members left him."

During the default hearing, defendant was permitted to extensively cross-examine plaintiff, call his own witness, seek affirmative relief, and testify himself. He testified at length as to custody and parenting time. That degree of participation is significantly greater than usually permitted during a

default hearing. The trial court considered the parties' testimony and the other evidence adduced during the hearing. We discern no abuse of discretion.

B.

Defendant argues the trial court erred in awarding plaintiff sole legal and residential custody of C.L. by failing "to analyze the evidence pursuant to . . . N.J.S.A. 9:2-4 and the standard of the best interests of the child." He contends the court should have awarded joint legal custody "with physical custody to only one and liberal visitation rights to the other." We disagree.

Our Legislature has determined "that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents have . . . dissolved their marriage." N.J.S.A. 9:2-4. Further, "it is in the public interest to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy." Ibid. In a proceeding concerning the custody of a minor child, the judge may award joint custody, sole custody with a provision for "appropriate parenting time for the noncustodial parent," or another arrangement that "the court may determine to be in the best interests of the child." N.J.S.A. 9:2-4(a) to (c). When deciding custody, the court must consider the following factors:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents'

willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.

[N.J.S.A. 9:2-4(c).]

The focus of this inquiry is "the best interests of the child." Ibid.; Sacharow v. Sacharow, 177 N.J. 62, 80 (2003). Although joint legal custody may be preferred in certain cases, as it may "foster the best interests of the child," Beck v. Beck, 86 N.J. 480, 485, 488 (1981), the decision concerning the type of custody is left to the sound discretion of the trial court, Pascale v. Pascale, 140 N.J. 583, 611 (1995).

In Nufrio v. Nufrio, 341 N.J. Super. 548 (App. Div. 2001), we explained how the relationship between parents should guide judges in deciding whether to award joint legal custody:

16

[T]he prime criteria for establishing a joint legal custodial relationship between divorced or separated parents centers on the ability of those parents to agree, communicate and cooperate in matters relating to the health, safety and welfare of the child notwithstanding animosity or acrimony they may harbor towards each other. The ability of parents to put aside their personal differences and work together for the best interests of their child is the true measure of a healthy parent-child relationship. A judicial custody determination must foster, not hamper, such a healthy relationship. Therefore, a parent's amenability or inability to cooperate with the other parent are factors to be considered in awarding joint legal custody.

[Id. at 550.]

In this matter, the trial court considered the statutory factors enumerated in N.J.S.A. 9:2-4(c) and made the following findings:

(1) "[T]here is no communication between the parents" and plaintiff has an active final restraining order[6] against defendant. "Defendant . . . will not be able to effectively co-parent with [p]laintiff until he completes the psychiatric and psychological treatment previously ordered, which he has yet to complete." "To date, [p]laintiff, through the imposition of

_____

[6] In awarding temporary custody under the Prevention of Domestic Violence Act, the court "shall presume that the best interests of the child are served by an award of custody to the non-abusive parent." N.J.S.A. 2C:25-29(b)(11). This presumption does not apply in divorce proceedings. R.K v. F.K., 437 N.J. Super. 58, 63-64 (App. Div. 2014). Instead, the divorce court should consider decide custody under a best interests analysis employing the factors set forth in N.J.S.A. 9:2-4, including "the history of domestic violence." Id. at 67. The trial court did not apply a presumption in favor of plaintiff and instead applied the N.J.S.A. 9:2-4 factors.

previous court orders has essentially been the sole legal custodian of the child. Plaintiff has been responsible for communicating with all providers for the child, including medical, dental, educational, and mental health practitioners."

(2) "Plaintiff has essentially had sole legal and residential custody of the child since the parties separated." "Defendant . . . has not had any unsupervised parenting time with [C.L.] since January of 2015."

(3) "Plaintiff is fully engaged with [C.L.] and shares a special bond with him." "Defendant spent a significant portion of time [away] from [p]laintiff and [C.L.] during the marriage due to his employment as a boat captain in Florida for a significant portion of each year."

(4) Plaintiff sought relief from domestic violence on three occasions, resulting in two TROs that were dismissed in favor of civil restraints. An active FRO remains in place.

(5) "Defendant represents a risk until his mental health needs are addressed. Defendant must learn to address his anger issues and learn coping mechanisms." His "mental health state" is "explosive. One cannot be certain what is going to set him off."

(6) C.L. is not of sufficient age and capacity to form an intelligent decision as to his preference for custody.

(7) C.L. "has very significant special needs and behavioral issues" requiring "numerous professionals" for his treatment. "Plaintiff has been able to provide [C.L.] with access to a structured program which presently provides all components of his treatment and

18

education in one location." Defendant's "insight into the severity of [C.L.'s] disability is quite limited."

(8) Plaintiff resides with her parents in Toms River while defendant lives in "a condominium in Florida" and "rents out an extra bedroom in the condo to another adult male. He has also indicated to the [c]ourt that the condo is going into foreclosure." There is no evidence that defendant "has any sort of residential security for himself, let alone a child.";

(9) C.L. "is presently attending a very structured program at Rutgers with mental health, behavioral and educational components. This provides an excellent opportunity to have all of the disciplines actively involved with the child on a regular basis."

(10) Although both parties "are fit parents," defendant's "parenting time has been progressively limited due to his inability to abide by court orders and to control his emotions."

(11) Plaintiff resides in Toms River while defendant resides approximately 1200 miles away in Florida.

(12) "Plaintiff has always been actively engaged with [C.L.] and they share a deep bond." She has always been C.L.'s primary caretaker. "[D]uring the course of the marriage, [d]efendant was frequently away from the home for extended periods of time as a result of his employment obligations."

(13) "Throughout the course of the marriage, [d]efendant has always been a ship captain who is involved with fishing tours and the like. In addition, . . . he has taken numerous side jobs, moving the yachts from one location to the other." Conversely, plaintiff is a certified public accountant who "at

19

present [is considering] part-time employment in the near future if [C.L.] remains stabilized at his present program."

(14) C.L. "is the only child of the marriage. Neither party has any other children."

The court also noted that C.L. has a variety of medical issues and "requires maintenance medications, home therapy as well as a very specialized education and mental health treatment program."

After considering these factors, the court determined that awarding plaintiff sole legal and residential custody was in C.L.'s best interests. The record amply supports the court's findings and legal conclusion. Requiring the parties to make joint decisions would be detrimental to C.L., especially given his significant psychological and medical conditions. Further, plaintiff's final restraining order against defendant adds to the impracticability of joint legal custody.

Additionally, plaintiff has had actual physical custody of C.L. since the parties separated and C.L. has always lived in New Jersey. Defendant works and lives in Florida most of the year while C.L.'s treatment team is based in New Jersey. Moreover, defendant has not adequately addressed his own

mental health issues.[7]  These considerations weighed heavily in favor of awarding plaintiff sole legal and residential custody.

Defendant further argues that a plenary hearing with testimony of the parties and expert witnesses was required before effectively terminating his right to parenting time, citing <u>Wilke v. Culp</u>, 196 N.J. Super. 487 (App. Div. 1984).  He also contends that a guardian ad litem should have been appointed for C.L. due to his special needs.  We disagree.

This case is readily distinguishable from <u>Wilke</u>.  First, defendant's right to parenting time was not terminated.  As we discuss <u>infra</u>, he was awarded appropriate parenting time under the circumstances.  Second, defendant did not name or call a proposed expert witness or produce an expert report during discovery.  Third, although the divorce proceeded by way of default, defendant was permitted to cross-examine plaintiff, call his mother to testify on his behalf, and then testify himself regarding custody.  The combined testimony aided the court in finding that "there is no communication between the

---

[7]  In its ruling, the court noted that defendant "acknowledged during his testimony that he understands that he is required to obtain the previously ordered psychiatric and psychological evaluations and comply with all recommendations before a court would entertain a request for any change in custody and parenting time."

parents," which is a permitted justification for awarding sole legal and residential custody to plaintiff.

In a case involving custody or parenting time, the court "may" appoint a guardian ad litem "to represent the best interests of the child or children if the circumstances warrant such an appointment." Rule 5:8B(a). The court may also appoint an independent expert "in its discretion" when the "disposition of an issues will be assisted by expert opinion." Rule 5:3-3(a). We review such decisions for an abuse of discretion.

The trial court found both parties are "fit parents. However, at present, [d]efendant's parenting time has been progressively limited due to his inability to abide by court orders and to control his emotions." Neither party called a psychiatrist or psychologist as a witness. Defendant acknowledges that C.L. is autistic and has "special behavioral and educational needs stemming from his numerous diagnos[e]s." C.L.'s medical diagnoses were never in dispute. Thus, neither expert testimony nor a guardian ad litem for C.L. was required. We discern no abuse of discretion.

The court awarded defendant the following parenting time:

> Defendant shall be permitted to have audio-only calls with [C.L.] on Tuesdays and Thursdays from 7:00 p.m. to 7:15 p.m. Defendant shall initiate the call between these times. Plaintiff shall have the

> obligation to provide the phone to [C.L.] when the call is received. If [C.L.] terminates the call without speaking to [d]efendant, [he] may initiate a second call to try and speak with the child. If [C.L.] terminates the second call, there shall be no further calls that evening. Defendant may not disparage or even mention [p]laintiff during his parenting time with the child. . . .

In so ruling, the court nevertheless indicated that if defendant subsequently complied with court orders, completed previously ordered psychiatric evaluation and recommended treatment, and controlled his emotions, it would consider an enhancement of defendant's parenting time.

A trial court's decision concerning custody or parenting time is reviewed for abuse of discretion. See, e.g., Pascale, 140 N.J. at 611. Defendant views the telephonic parenting time as "punishment . . . for his failure to abide by court orders." We disagree.

During many of the earlier FaceTime calls, defendant repeatedly communicated directly with plaintiff, despite the restraining orders, and disparaged her directly to C.L. Moreover, plaintiff testified that during the FaceTime sessions, C.L. "routinely throws a temper tantrum, destroys or attempts to destroy property, including the iPad device he" used to communicate with defendant, "attacks [her], screams, runs away, [and] otherwise engages in obstreperous behavior."

23

In addition, defendant had been ordered since December 2015 to undergo a psychiatric evaluation and never fully complied. The aim of the evaluation was twofold: to alleviate the stress of the FaceTime calls and allow defendant to seek treatment for his self-described "longstanding psychiatric issues." Moreover, the court held that if the telephone calls continued successfully for at least eight weeks, defendant could apply to have the FaceTime parenting time reinstated even while the evaluations were underway. We discern no abuse of discretion in limiting the telephonic calls to C.L.

## C.

Defendant argues the trial court erred in calculating child support because it did not account for his expenses in providing health insurance for C.L. In his reply brief, defendant clarified that: "At the time of trial the [d]efendant was unemployed and had secured health insurance for [C.L.] via a very expensive COBRA plan. Health insurance is now available for [C.L.] through the [d]efendant's employment and he has obtained same for him pursuant to his obligation under the Child Support guidelines."

During the default hearing, defendant requested that his obligation to provide health insurance for C.L. be eliminated. Plaintiff agreed. The trial court ruled there would "be no credits on either side for medical insurance as

the child is presently covered by NJ Family Care at no cost to [p]laintiff. Should this change at some time in the future the issue of payment will need to be readdressed by the [c]ourt." The court noted the parties agreed this health insurance arrangement should continue for as long as permitted. We discern no abuse of discretion.

## D.

Defendant contends plaintiff removed several of his Rolex watches from the marital residence. He argues the trial court erred by failing to consider receipts for the watches that demonstrated their value. We are unpersuaded.

During cross-examination, plaintiff testified that defendant owned several Rolex watches and that when she vacated the marital home, in January 2015, she did not know exactly where they were. She suspected they were still in a safe kept in the home that both parties had the combination to. Plaintiff explained that after she left, she did not regain "dominion and control" of the home until October 2015. During that period, she "never saw the watches" and did not provide anyone else with the code to the safe.

On direct-examination, defendant testified that he kept four Rolexes, other watches, important papers, and jewelry in the safe in the master closet. He verified that only he and plaintiff had access to the safe. Defendant

25

explained that he last opened the safe in September 2015 and the watches were still inside. However, sometime after October he checked again and discovered that "the safe was empty."

The trial court determined that defendant claimed that items that belonged to him were missing from the marital home but "provid[ed] nothing of substance in that regard other than the invoices for some watches that he purchased. Defendant requested $20,000 in exchange for the 'missing' property." The court found "[p]laintiff vacated the marital home in January 2015 and never returned to live there. Defendant utilized the home whenever he was in the area." The home was sold in November 2016. "Defendant had ample time to remove his possessions prior to the sale." The court concluded there was insufficient evidence "regarding the 'missing' property" and "insufficient evidence that the watches were in the marital home at the time it was sold. It was just as likely that these items were removed by [d]efendant during his last stay at the home."

"We ordinarily defer to the factual findings of the trial court [based upon evidence adduced at a hearing,] because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand [and] it has a 'feel of the case' that can never be realized by a review of the cold

record."  N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

Defendant presented no direct evidence of theft or conversion by plaintiff.  Defendant had the opportunity to remove the watches himself.  We discern no error by the trial court.  It did not impermissibly ignore evidence of the purchase of the watches.  Indeed, plaintiff did not contest that defendant owned several Rolex watches.

Additionally, defendant argues:  (1) the "court failed to consider that during the marriage that the majority of the credit card spending was done on credit cards in the [d]efendant's name"; (2) "he was left with the repossession debt for the parties [2010] BMW 528i [(5-series)] for which he was ordered to pay the [p]laintiff $5,000.00"[8]; and (3) "the [c]ourt did not articulate a reason for the unequal allocation of the debt."

Under equitable distribution, the statutory factors enumerated in N.J.S.A. 2A:34-23.1, "used in concert with the facts of each case," afford "broad discretion" to the trial judge.  Steneken v. Steneken, 367 N.J. Super.

---

[8]  The parties owned a 2007 BMW 3-series and the 2010 5-series automobiles. In his brief, defendant appears to conflate the cars.  Although the 5-series was repossessed, defendant testified that he still owed $16,000 for that car, not $5,000.  The judgment awarded plaintiff a $5,000 credit for her share of the 3 series due to defendant selling it and retaining the proceeds.  The judgment does not specifically discuss the 5 series loan balance.

427, 434-35 (App. Div. 2004), aff'd as modified, 183 N.J. 290 (2005).  As a result, "[w]here the issue on appeal concerns which assets are available for distribution or the valuation of those assets, it is apparent that the standard of review is whether the trial judge's findings are supported by adequate credible evidence in the record."  Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978).  Similarly, where the issue involves the manner in which the trial court allocated the marital assets, we review the trial court's determination under an abuse of discretion standard.  Id. at 444.

The trial judge applied the equitable distribution factors enumerated in N.J.S.A. 2A:34-23.1 and determined:

> Plaintiff proposes that she will retain her present credit card balances involving a Chase Credit Card and a Citi card in a total amount of $20,636.00.  Plaintiff asserts that this debt is marital in nature as it was incurred for the benefit of the child or for counsel fees.  Plaintiff will accept this debt if she is awarded an additional $50,000.00 in counsel fees.  Plaintiff also proposes that [d]efendant be entirely responsible for any credit card debt in his name, including but not limited to American Express and Velocity.  Plaintiff requests that she be indemnified and held harmless as [d]efendant has not provided a complete accounting of his credit card debts.
>
> Plaintiff also asserts that she will retain responsibility for a Home Equity Line of Credit taken on her parent's home, ostensibly to pay for legal fees

28

and costs of litigation in the amount of approximately $37,000.00.

Defendant agrees with all of the proposals of [p]laintiff provided that the additional $50,000.00 in contribution towards [p]laintiff's legal fees is not awarded.

Ultimately, the court sided with defendant when it: (1) ordered each party to "retain all credit card debt in their own names"; (2) ordered plaintiff to "retain responsibility for the home equity loan"; (3) denied plaintiff's request for an additional $50,000 in counsel fees; and (4) ordered "that any other debt in either party's name not specifically enunciated herein, shall be the sole responsibility of that party." Defendant's argument on appeal amounts to invited error.

"The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." Brett v. Great Am. Recreation. Inc., 144 N.J. 479, 503 (1996). Defendant acknowledged that he would accept plaintiff's proposal excluding the $50,000 she desired in counsel fees. The court agreed, stating it was disinclined to award an additional $50,000 in counsel fees to plaintiff.

Because defendant acquiesced to this proposal at the trial level, he cannot claim it was error on appeal.

As to the BMWs, both parties' Case Information Statements listed the value of the 3-series at $10,000. At some point prior to the default hearing, defendant sold it for $1200 and "refused to provide [plaintiff with] the name of the individual who purchased" the car "or even the date of sale." Accordingly, plaintiff proposed that she "receive a credit in the amount of $5,000" against defendant's share of her retirement accounts. Defendant relied on a CARFAX report that indicated the vehicle was a total loss due to "non-collision damage" and was declared a "total loss" by the insurer. Defendant claimed that the vehicle was a "total loss" because of "damage to the wiring harness." Defendant confirmed he sold the car for $1200 to a stranger after visiting a car dealership that would not purchase it. When the court asked how he found the buyer, defendant replied "the car guy that delivers the cars [at a dealership] said, 'I know someone that would want the car.'"

Ultimately, the court found defendant provided insufficient information provided as to the whereabouts of the 3-series, found his explanation for what happened to it unconvincing, and awarded plaintiff a resulting $5000 credit

towards defendant's share of plaintiff's retirement accounts. These findings and determination are supported by the record. We discern no error.

Defendant filed written opposition to the proposed FJOD. Although defendant opposed awarding plaintiff any credit related to the 3-series, he stated he had "[n]o objection to both parties being solely liable for debts in their name." The 5-series automobile loan was in defendant's name. The trial court did not separately address defendant's liability for the 5-series loan. Instead, the FJOD states: "Any other debt in either party's name not specifically enunciated herein, shall be the sole responsibility of that party who shall indemnify and hold harmless the other party." Defendant cannot now complain that he should not be solely responsible for this debt.

### E.

Defendant argues the trial court erred in awarding plaintiff $25,000 in counsel fees because it "did not satisfy the requirements outlined in" N.J.S.A. 2A:34-23, Rule 5:3-5(c), and Rule 4:42-9(b)- to (d). We agree that the trial court did not adequately set forth its findings of fact and conclusions of law.

"A lawyer's fee must be reasonable." Giarusso v. Giarusso, 455 N.J. Super. 42, 50 (App. Div. 2018) (quoting Rosenberg v. Rosenberg, 286 N.J. Super. 58, 69 (App. Div. 1995)). Determining the reasonableness of the fee

31

"involves determining the number of hours reasonably expended multiplied by a reasonable hourly rate." Id. at 51 (citing Rendine v. Pantzer, 141 N.J. 292, 334-35 (1995)). The factors to be considered in determining the reasonableness of an attorney's fee include: "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"; "the amount involved and the results obtained"; and "whether the fee is fixed or contingent." Ibid. (quoting RPC 1.5(a)(1), (4), and (8)). "Compiling raw totals of hours spent, however, does not complete the inquiry. It does not follow that the amount of time actually expended is the amount of time reasonably expended." Ibid. (quoting Rendine, 141 N.J. at 334-35).

An appellate court will not disturb a counsel fee award in a matrimonial case except "on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine, 141 N.J. at 317). When awarding counsel fees, the judge should consider:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5)

any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[R. 5:3-5(c); see also Mani v. Mani, 183 N.J. 70, 94-95 (2005); N.J.S.A. 2A:34-23 (providing that the judge "shall consider the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party").]

A trial judge's failure to consider the appropriate factors, make the required findings, and state its conclusions of law, constitutes a clear abuse of discretion. Saffos v. Avaya Inc., 419 N.J. Super. 244, 271 (App. Div. 2011); see also R. 1:7-4(a).

Here, the court held that plaintiff's Fidelity IRA, valued at $77,412.66, was marital property and ruled that defendant was entitled to one-half of its value ($38,706.33). The court further held that defendant's 401(k) retirement account through Fidelity Investments in the amount of $25,106.56 was also marital property. The court then stated, "[i]t is also uncontroverted that [d]efendant liquidated this entire account during the course of the litigation. Thus, the marital coverture portion of this account available to [p]laintiff would be $12,553.28."

The court reduced defendant's share of plaintiff's IRA by $12,553.28, making his total $26,153.05 because "[p]laintiff was forced to incur additional counsel fees due to the behavior of [d]fendant.  Accordingly, the [c]ourt will reduce this share by $25,000.00 towards counsel fees of [p]laintiff, thus leaving a balance of $1,153.05."  It provided no further analysis for the $25,000 counsel fee award.  In turn, the FJOD states "[p]laintiff shall receive a credit of $25,000 from [d]efendant's share of her retirement account as an additional contribution toward counsel fees."  It also then noted "[t]here shall be no further adjustments for counsel fees previously incurred in this matter."

The court did not determine the lodestar or analyze the Rule 5:3-5(c) and RPC 1.5(a) factors.  Accordingly, we are unable to determine whether the $25,000 counsel fee award is reasonable under the applicable guidelines.

"Trial judges are under a duty to make findings of fact and state reasons in support of their conclusions."  Giarusso, 455 N.J. Super. at 53 (quoting Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996)); accord R. 1:7-4(a) (requiring trial courts to "find the facts and state its conclusions of law").  "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion."  Ibid. (quoting Strahan, 402 N.J. Super. at 310).

We vacate the counsel fee award and remand as the trial court failed to make the required findings and state its conclusions of law regarding the lodestar and application of the Rule 5:3-5(c) and RPC 1.5(a) factors. On remand, the judge shall make specific findings of fact and conclusions of law in compliance with Rule 1:7-4(a). We express no opinion as to the appropriate fee award in this matter.

F.

Defendant's remaining arguments do not warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

In sum, we affirm the judgment except for the counsel fee award, which we vacate and remand for further proceedings consistent with this opinion.

Affirmed in part and vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4423-18T3